**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

RICARDO HOPKINS, Individually and as Parent and Next of Kin to DIONNE NALLS And ERICA HOPKINS,

**Plaintiff**

Vs. C.A. No. 04-373L

THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS; DEPARTMENT OF CHILDREN, YOUTH & FAMILY, JAY G. LINDGREN, JR., Individually and in his capacity as Director of DCYF; THOMAS M. BOHAN, ESQUIRE, Individually and in his capacity as Executive Director Administration; THOMAS DWYER, Individually and in his capacity as Associate Director Child Welfare Services; KEVIN AUCOIN, Individually and in his capacity as Chief Legal Services; SUZAN MORRIS, Individually and in her capacity as Senior Legal Counsel; PATRICIA PETRELLA, Individually and in her capacity as Legal Counsel to DCYF; ELLEN BALASCO, Individually and in her Capacity as Legal Counsel to CASA; KAREN DEGENOVA, Individually and in her capacity as a DCYF Investigator

**Defendant**

## STATEMENT OF UNDISPUTED FACTS

1. On 2/12/2001 Yolanda Gabriel, a social worker at Butler Hospital called the DCYF Child Abuse and Neglect Hotline pursuant to R.I. Gen Laws 40-11-3 (a) to report the following:

   Reporter is a social worker at Butler Hospital (Yolanda Gabriel – 455-6329): Yolanda stated that Crystal Jones (age 19) who is still in DCYF Custody disclosed that she was sexually abused by Ricardo Hopkins. Ricardo was an adopted son of Nina Hopkins. Ricardo sexually abused Crystal from age 3 to 14. She ended up running away from the foster home and did not want to tell her foster mom because

she liked her and didn't want to hurt her. Crystal was not given any specifics as therapist did not want to push it at this time as she has PTSD.

(Deposition of Karen Degenova Deposition Exhibit A – Exhibit 1)

2. At the time this call came in the DCYF floor worker who took the call determined that at that time the Hopkins home was listed as an active foster home but the license had expired.

   (Deposition of Karen Degenova Deposition Exhibit A – Exhibit 1)

3. At the time this call came in Crystal Jones was still in DCYF custody even though 19 years old.

   (Deposition of Karen Degenova Deposition Exhibit A – Exhibit 1)

4. At the time the alleged sexual abuse occurred both Crystal Jones and Ricardo Hopkins were foster children living in the Hopkins home, a DCYF licensed foster home.

   (Deposition of Karen Degenova at page 22 – Exhibit 2)

5. At the time DCYF initiated its investigation into Crystal Jones' allegations of sexual abuse against Ricardo Hopkins he was employed by Whitmarsh Corporation and Communities for People, Inc.

   (Deposition of Daniel Lopes at pages 11 and 12 – Exhibit 3)

   (Deposition of Michael Terry at pages 10 and 11 – Exhibit 4)

6. At the time of this investigation Whitmarsh Corporation was a "Youth Serving Agency" as defined in R.I. Gen Laws 40 –13.2 –1 (5).

   (Deposition of Michael Terry at pages 8, 9 – Exhibit 5)

7. At the time of this investigation Communities for People, Inc., was a "Youth Serving Agency" as defined in R.I. Gen Laws 40 –13.2 –1 (5).

   (Deposition of Daniel Lopes at pages 7, 8 – Exhibit 6)

8. At the time of this investigation Ricardo Hopkins was a "Youth Serving Agency Worker" as defined in R.I. Gen Laws 40 –13.2 –1 (6).

   (Deposition of Michael Terry at pages 11, 12 – Exhibit 7)

   (Deposition of Daniel Lopes at pages 11, 12, 13 – Exhibit 8)

9. On 2/13/2001 DCYF Child Protection Investigator Karen DeGenova was assigned to investigate Crystal Jones' allegations against Ricardo Hopkins.

   (Deposition of Karen Degenova page 16 – Exhibit 9)

10. Throughout the investigation Karen DeGenova sought the advice and instructions of her supervisor Edward Albanese and legal counsel.

    (Deposition of Karen DeGenova Deposition pages 16, 34, 35 – Exhibit 10)

    (Deposition of Patricia Petrella at page 33 – Exhibit 11)

11. On 2/13/06 Karen DeGenova's supervisor Edward Albanese gave Karen DeGenova a directive:

    > That in light of the pending sexual abuse investigation, that Mr. Hopkins could not be living in the same house with his young daughter because that would pose a potential risk to her, and so I had to go back to the house, go back inside the house and convey that to him and ask him if he had somewhere else he could go stay voluntarily, and if he didn't, then DCYF would have to take custody of the child.

    (Deposition of Karen DeGenova Deposition at pages 35, 36 – Exhibit 12)

12. Although he wasn't overly happy about it Ricardo Hopkins agreed that he could find somebody to go stay with on a temporary basis.

    (Deposition of Karen DeGenova Deposition at page 37 – Exhibit 13)

13. DeGenova was involved in the Ricardo Hopkins case less than 10 days.

    (Deposition of Karen DeGenova Deposition at page 61 – Exhibit 14)

14. During the course of the investigation CPI DeGenova interviewed 18 people including the Complainant, Crystal Jones, the Plaintiff, Ricardo Hopkins, his foster mother, and his children.

(Deposition of Karen DeGenova Deposition at page 41 and Deposition Exhibit C – Exhibit 15)

15. At the conclusion of her investigation, CPI DeGenova conferred with DCYF Legal Counsel Gary Pellicano before filing a petition in Family Court.

(Deposition of Karen DeGenova Deposition Exhibit H page 1 – Exhibit 16)

16. As part of her investigation, Karen DeGenova prepared a "Summary of Facts to Substantiate Allegations of Abuse and Neglect" which was reviewed and signed off on by her supervisor Edward Albanese.

The Summary of Facts reads as follows:

> On 2/12/01, a call was received by the Child Abuse Hotline from a social worker at Butler Hospital. Reporter stated that Crystal Jones, age 19 and still DCYF custody, disclosed that she was sexually abused by Ricardo Hopkins. She stated that this abuse had occurred while she was living in the Hopkins' foster home, and that Ricardo was the adopted son of the foster mother.
>
> CPI met with Crystal Jones who reported that she was sexually molested by Ricardo Hopkins, 10 years her senior, from age 6-14, at which time she ran away from her foster home. She stated that he touched her chest and vagina, and that he would ejaculate on her. She stated that the abuse happened about 3 times per week. She stated that he would threaten her not to tell.
>
> Crystal stated that she never told anyone of the abuse until after she ran away from the Hopkins home. About 3 or 4 years ago, she told her older sister Jessica Jones about the abuse. Jessica urged Crystal to tell someone else and to get counseling, but Crystal refused and swore Jessica to secrecy.
>
> Ricardo Hopkins denied that he sexually molested Crystal Jones. On 2/13/01, he agreed to leave his home pending the results of the investigation, as he has a 3 ½ year old daughter who resides with him, and a 4 year old son of whom he has joint custody who visits from Thursdays-Sundays.

Child Protective Investigator spoke with DCYF FSU worker Fran Guevremont, the Butler Hospital Social Worker, and two staff from Tzwapi House where Crystal resides, all of whom believe Crystal's disclosure and feel that she would have nothing to gain by making false allegations. Crystal's diagnosis upon discharge from Butler Hospital was PTSD, based upon the trauma of sexual abuse. The allegation of sexual molestation was indicated against Ricardo Hopkins.

Dionne Nalls did not disclose any molestation by his father. He did state, however, that his father had tied his hands and feet and spanked him. Ricardo Hopkins denied this allegation; however, Dionne's half-sister Erica Hopkins who resides with Mr. Hopkins also disclosed that her father had tied up both herself and Dionne, then spanked them, during discipline. The allegations of excessive/inappropriate discipline and tying/close confinement were indicated against Ricardo Hopkins.

On 2/20/01, an additional allegation was received regarding Ricardo Hopkins. Dionne's brother Douglas Nalls, age 7, had disclosed to his grandmother that when he used to visit the Hopkins home, Ricardo Hopkins would make him pull his pants down and would touch and rub his penis. Douglas later recanted this allegation, so it will be unfounded. Douglas did state, however, that when he used to visit the Hopkins home, Ricardo Hopkins would tie his hands and feet, put a sock in his mouth, and hit him. He also stated that Mr. Hopkins would tie his hands and feet, put a dirty sock in his mouth, and put him in the shower. He stated that Mr. Hopkins would do this when he was mad at him. An allegation of excessive inappropriate discipline and tying/close confinement will be indicated against Ricardo Hopkins with Douglas Nalls as a victim.

Given the recent indicated allegations indicated against Ricardo Hopkins, the Department respectfully request temporary custody of the minor child, Dionne Nalls, in order to ensure his safety and well-being.

(Deposition of Karen DeGenova Deposition at pages 68, 69 and Deposition Exhibit G – Exhibit 17)

17. Karen DeGenova testified as a witness for DCYF on May 21, 2001 in the matters of Erica and Dionne.

(Family Court Transcript May 21, 2001 at page 4 – Exhibit 18)

18. The indicated Abuse or Neglect finding of sexual molestation against Ricardo Hopkins was disqualifying information for employment as a "Youth Serving Agency Worker" as defined in R.I. Gen Laws 40 - 13.2 - 1 (6) and set forth in DCYF Policy: 700.0105 "Clearance of Agency Activity – Addendum, Disqualifying information."

19. Service Providers that are under contract to DCYF are not supposed to be staffed with people that have disqualifying information on the record.

    (Deposition of Thomas Bohan at page 32 – Exhibit 19)

20. In the context of monitoring contracts that DCYF has with child care providers, such as Whitmarsh and Communities for People, if DCYF becomes aware of a current employee for one of those companies that acquires disqualifying information after they have begun employment with one of these child care providers that is under contract with DCYF, DCYF's position is the same as if they had acquired the disqualifying information prior to employment, that they are, in fact, disqualified, and DCYF makes the service provider aware of that fact.

    (Deposition of Thomas M. Bohan at page 32 and 33-34 – Exhibit 20)

21. At some point during the CANTS investigation of Mr. Hopkins, Communities for People, Inc. was made aware of disqualifying information regarding Mr. Hopkins and he was suspended and then terminated from employment. The specific disqualifying information (that he had been indicted for sexual molestation) was not disclosed to his employer.

    (Deposition of Daniel Lopes at pages 17,18 – Exhibit 21)

    (Deposition of Craig Gordon at pages 8, 9 – Exhibit 22)

22. At some point during the CANTS investigation of Mr. Hopkins, Whitmarsh Corporation was made aware of disqualifying information regarding Mr. Hopkins and he was terminated. The specific disqualifying information (that he had been indicted for sexual molestation) was not disclosed to his employer.

    (Deposition of Michael Terry at page 22, 23 – Exhibit 23)

23. At all times material to this action Suzan Morris was employed by DCYF as Regional Director of Region 3 covering the South County and Kent County area of Rhode Island. She has never been senior legal counsel for DCYF, has never been licensed to practice law and has no knowledge of or involvement with Ricardo Hopkins as alleged in this case or otherwise.

(Affidavit of Suzan Morris – Exhibit 24)

24. At all times material to this action Ellen Balasco was employed by the State of Rhode Island Family Court Judiciary as a Staff Attorney for the Office of the Court Appointed Special Advocate. Balasco's only involvement in the Ricardo Hopkins Family Court proceedings was that she was appointed to act a guardian *ad litem* for Crystal Jones, a complaining witness against Ricardo Hopkins, and in that capacity Balasco accompanied Crystal Jones to her deposition held in the Garahy Judicial complex conducted by counsel for Ricardo Hopkins. She had no other contact with or knowledge of the allegations made by Hopkins in this case.

(Affidavit of Ellen Balasco – Exhibit 25)

25. At all times material to this action Jay Lindgren was employed as Director of the Department of Children, Youth, and Families. In that capacity he had executive responsibility for the overall supervision and management of the Department.

(Affidavit of Jay Lindgren – Exhibit 26)

26. Prior to being served with notice of the instant lawsuit, Jay Lindgren had no knowledge of the Department's involvement in the case involving Ricardo Hopkins.

(Affidavit of Jay Lindgren – Exhibit 26)

(Deposition of Kevin Aucoin at page 52, Exhibit 27)

27. In his capacity as Director, Jay Lindgren had no involvement in the case management decisions with respect to the case involving Ricardo Hopkins.

(Affidavit of Jay Lindgren – Exhibit 26)

28. Jay Lindgren had no knowledge of the race and/or ethnicity of Ricardo Hopkins or his children prior to being served with a summons and amended complaint in the instant case.

(Affidavit of Jay Lindgren – Exhibit 26)

29. Pursuant to DCYF Protocol, a person's race is not a factor that is considered by DCYF in its decision with respect to the initiation of and/or the manner in which the Department conducts its investigation of child abuse and neglect.

(Affidavit of Jay Lindgren – Exhibit 26)

30. At all times material to this action Thomas M. Bohan was Executive Director of DCYF. He first became aware of allegations of sexual molestation and physical abuse allegations against Ricardo Hopkins when this lawsuit was filed. Bohan doesn't have any recollection of Mr. Hopkins or the allegations against him prior to the filing of this lawsuit.

(Deposition of Thomas M. Bohan at page 9 – Exhibit 28)

31. Thomas M. Bohan did not know Ricardo Hopkins' race until after this lawsuit was filed, it makes no difference to Mr. Bohan what race a person is when they encounter DCYF and Mr. Bohan had no personal involvement with the Ricardo Hopkins case.

(Deposition of Thomas M. Bohan at page 31, 32 – Exhibit 29)

32. At all times material to this action Thomas Dwyer was employed by DCYF as the Associate Director for Child Protection and Child Welfare. In that capacity he supervised the Division of Child Protective Services as well as the Division of Social Services.

Mr. Dwyer has a vague recollection of discussions of the Hopkins case.

To the best of his recollection, the principle concern in the Hopkins case was around the safety of Mr. Hopkins' young children. The concern was based upon allegations that Mr. Hopkins had sexually molested a child, Crystal over a period of approximately six years.

That as the State child protective agency, we had a duty and obligation to assess the safety and well being of Mr. Hopkins' children. In order to do so, we had to interview Crystal and based on that interview, determine if we still had concerns regarding Mr. Hopkins' children.

That based up on Crystal's statements, we felt that we had the need to interview Mr. Hopkins' children and determine if there existed the presence of safety and risk factors.

That while he has no specific recollection regarding Mr. Hopkins' employment status, if DCYF had cause to believe that an individual, who may pose a risk to children, was working in a DCYF licensed facility, DCYF would request that the agency resubmit a background check on the individual and, based on that, take appropriate action.

That at no time during his involvement with the case was Mr. Hopkins race/ethnicity a factor in any decision-making and he was not aware of Mr. Hopkins' racial background, until he read it in the law suit.

(Affidavit of Thomas Dwyer – Exhibit 30)

33. At all times material to this action Patricia Petrella was employed by DCYF as Senior Legal Counsel and her job responsibilities were to prosecute child abuse and neglect cases and to prepare trial discovery requests and prepare witnesses and prosecute child abuse proceedings.

(Deposition of Patricia Petrella at pages 4, 5 – Exhibit 31)

34. Patricia Petrella first became involved in Mr. Hopkins' case when she covered the arraignment of Ricardo Hopkins and his lawyer Alan Gelfuso asked for a probable cause hearing.

(Deposition of Patricia Petrella at page 6 – Exhibit 32)

35. In February of 2001 Patricia Petrella reported to Kevin Aucoin.

36. Family Court records indicate that the Court continued the Hopkins' cases, so the arraignment was scheduled for 3-1 and probable cause for 3-7. On 3-7 it was continued to 3-8. On 3-8 the probable cause was set for 3-29. On 3-29 it was set for 3-30. On 3-30 Mr. Gelfuso filed a Motion to Dismiss based on lack of jurisdiction. We set that down for 4-3. On 4-3 we set it for 4-4. Then we had the hearings on 4-4 and 4-6. Judge Suttell made his decision that the respondent's Motion to Dismiss is denied on April 12, 2001.

Then we set it down for trial. That decision was on 4-12, we set a schedule for 4-26. On 4-26 we set the trial dates for 5-15, 5-21, 6-4, and 6-6. After those four days of hearing then Judge Suttell made his decision on July 3rd. And we had – we must have had more days of hearing, which I don't have those dates, and then he made his decision ultimately to dismiss the case on July 30th, '01.

(Deposition of Patricia Petrella at pages 39 and 40 – Exhibit 33)

37. It was all with the Court's approval that the Hopkins Family Court cases were continued.

(Deposition of Patrica Petrella at page 40 – Exhibit 34)

38. At all times material to this action Kevin Aucoin was Associate Director of Legal Services for the Department of Children Youth and Families, in function Chief of Legal Services for DCYF.

(Deposition of Kevin Aucoin at page 5 – Exhibit 35)

39. An attorney is assigned to prosecute the DCYF petition that is filed in the Court after it is filed. Prior to the filing of the petition, the DCYF legal office provides consultation service to the division of, in this case, Child Protective Services, during the course of their investigation so the legal office would be available to review the case with the assigned investigator and/or her supervisor or his supervisor ultimately make a determination about what if any legal action needed to be imposed or pursued.

(Deposition of Kevin Aucoin at pages 10, 11 – Exhibit 36)

40. Typically new investigators rely on their supervisors to provide them guidance and oftentimes will dictate to the new investigator when its time to seek legal consultation on a case.

(Deposition of Kevin Aucoin at page 14 – Exhibit 37)

41. Aucoin assumes that he may have been the attorney that first became involved in the case because he recalls a phone call from Alan Gelfuso to inquire about the investigation on behalf of Mr. Hopkins and to vouch for the integrity and credibility of Mr. Hopkins.

(Deposition of Kevin Aucoin at pages 20, 21 – Exhibit 38)

42. Regarding who at DCYF notified Hopkins employers Aucoin testified as follows:

Q. Okay, and it states – and this is referring to the part that's dated February 14 – Kevin will advise us if we can breach confidentiality in order to satisfy attorney (a duty) to warn the employer. Now, my client was employed by Whitmarsh House, as well as Communities for People, worked in two separate group homes. At some point, they were notified of this matter; and as a result of that, he was terminated from both of those positions. Do you know who was involved in that decision?

A. I don't.

Q. Do you know who would know?

A. It would only be an assumption on my part that any notification that would have occurred would have gone through either the Department's licensing unit, contracts unit, and/or the contracts unit. I should say that in general – and this predates this '01 – in general, any time we have a case or a situation involving a child care employee, whether it's working child care employment with the State or in a private vendor, such as this, if we become aware that that child care employee has picked up, or has picked up a charge, has been convicted of a crime, and/or has been indicated in a child welfare case for conduct on an offense that would otherwise disqualify them from seeking child care employment, we would ask the child care provider to resubmit a background check on that employee. That would be the manner in which we would deal with that, in general.

Q. Now, by we, who do you mean?

A. We, the Department

Q. The Department as a whole?

A. As a whole.

Q. Would that be handled by legal counsel's office or licensing and/or the contracts unit?

A. Generally it would be handled through licensing and the contracts department.

Q. And was that done in this case, to your knowledge?

A. That, I don't know.

(Deposition of Kevin Aucoin at pages 27, 28 and 29 and Deposition Exhibit 1 page 14 – Exhibit 39)

43. In response to Plaintiff's counsel's question "… I just want to know what happened in any conversation you may have had with Ms. Petrella prior to this hearing regarding what was pending at the hearing?"

Aucoin answered,

A. The thing that does come to mind is that prior to this hearing, there had been a Motion to Dismiss filed by Mr. Hopkins through counsel, and I do recall speaking to Patricia about the Motion to Dismiss and a posture that we would take in the event the Motion to Dismiss was granted.

Q. Okay.

A. It doesn't mean we didn't talk about the other aspects of it, but I do recall speaking about the Motion to Dismiss.

Q. All right, and to your recollection now, what were your grounds for opposing the Motion to Dismiss?

A. In order to answer that, I think it's important to know at least what I understood to be the premise for the Motion to Dismiss. There was a claim that the Department did not have statutory authority and that the Family Court lacked subject matter jurisdiction to hear this case, because the Department did not have the authority to investigate the allegations. Our position – at least my position on that was that DCYF did have authority

to investigate this case on the premise that Crystal Jones' allegations referenced alleged sexual contact between Mr. Hopkins and she at the time when both she and Mr. Hopkins were minors. I believe, as we noted earlier, Ms. Jones was six – alleged that she was six years old when it began, and it went until she was approximately 14. Mr. Hopkins, I believe, would have been approximately 16 years old at the time that this would have started, and that under the provisions of Rhode Island General Law 40-11-3, there's a duty on the part of any individual to report sexual contact and sexual abuse between two children. The Department – in addition to that, the Department, under Rhode Island General Law 40-11-7, has a statutory duty to investigate any report of abuse and neglect that is made pursuant to Rhode Island General Law 40-11-3. In my opinion, the fact that there is a statutorily imposed duty to investigate complaints of sexual abuse involving one child against another child, and the fact that Crystal at the time she was alleging this occurred, was actually living in a foster home, I believe the foster home that – the foster parent who had adopted Ricardo, that the Department had a statutory interest in investigating the complaint and actually had a mandate to investigate the complaint. So, we believe that the case was properly investigated. We also believe that Crystal's allegations, to the extent that they involved her as a child and involved Ricardo as an older child, and the other information that we obtained during the course of the investigation relating to Mr. Hopkins' other two children – now I'm referencing Erica and Dionne – in which there appeared to be allegations of excessive inappropriate discipline and perhaps excessive corporal punishment, that those all justified the initiation of a petition in the Family Court.

(Deposition of Kevin Aucoin at pages 40, 41 and 42 – Exhibit 40)

44. Although Supreme Court Duty Judge Goldberg made comments questioning the strength of DCYF's case against Hopkins, she declined to take any action at that time and remanded the case back to the Family Court. The Department, believing Family Court Judge Suttell's determination that there was a statutory basis upon which to proceed to be the law of the case, felt that it had proper authority and that the Family Court had jurisdiction to hear the matter.

(Deposition of Kevin Aucoin at page 46 –Exhibit 41)

45. Aucoin as Chief Counsel heard what Justice Goldberg was saying, but by the same token, DCYF had a finding and conclusion by the Family Court Judge which in essence the Judge agreed with DCYF's argument, concerning statutory authority and jurisdiction and there was no order entered by the Supreme Court that interfered with the right of the Department to pursue its claim. So at that point the Department decided that it would continue to proceed in attempting to present its case to support the allegations of abuse and neglect.

(Deposition of Kevin Aucoin at pages 47, 48 – Exhibit 42)

46. The Motion to Dismiss filed on March 30, 2001 on behalf of Ricardo Hopkins claimed in essence that Ms. Jones' disclosures do not constitute child abuse as statutorily defined and therefore, DCYF not only lacked legal authority to conduct the subsequent investigation, but that it conducted the investigation in violation of its own rules and guidelines. That as a consequence, Mr. Hopkins has been deprived of his constitutionally protected rights to due process. The petitions should be therefore dismissed and all DCYF records and findings expunged on the theory that the original

investigation is tainted and all evidence and findings obtained in furtherance thereof are nothing more than fruit from a poisonous tree.

(Transcript of April 12, 2001 pages 2 and 3 – Exhibit 43)

47. In rejecting Hopkins' arguments and denying the Motion to Dismiss the Court made the following findings and comments.

"... however, these petitions were not filled to protect Crystal Jones, rather they were filed to protect Erica Hopkins and Dionne Nalls. Defined by Rhode Island State Laws, and there is "reasonable cause to believe that abuse and/or neglect circumstances exist or it could hardly be argued from what is now generally accepted about persons who sexually abuse children, that an identified child molester, at least until such time as he or she successfully completes treatment, does not pose a risk of harm to any child that may come under his or her care. Judge Hurst made this very clear in Marold versus Fendetti, wherein she wrote: "The State unquestionably possesses a strong interest in protecting children from the infliction of physical harm and from exposing them to the risk of sexual predators." It may be argued that the Butler Hospital social worker had no duty to notify DCYF of Crystal's disclosures given the fact that she was nineteen years old. But once having been notified, I believe, DCYF had an obligation to investigate, not necessarily because such an investigation was mandated by 40-11-7, but rather because it falls within the purview of its responsibilities under 40-11-7 and Chapter 42-72, particularly in light of the fact that Crystal Jones, even though nineteen years old, is still committed to the care and custody of DCYF and thus the department remains responsible for her welfare; and secondly, that respondent was employed at Whitmarsh, a group home for children and DCYF is statutorily responsible for the certification of all child care personnel as

well as for the administration of the CANTS system. Respondent cites the Marold case for the proposition that "by definition an act of child abuse or neglect can only be committed by a person responsible for the child's welfare." That case also states, however, "that a perpetrator of an act of abuse or neglect may ultimately be determined to be a person not falling with the statutory definition of responsible person should not hinder the DCYF's investigation powers so long as the investigation is legitimately instituted." In this case, I find that the investigation was legitimately instituted for the above stated reasons, namely that Crystal was a committed child and respondent an employee of a child care facility, as well as for the fact that the reported abuse allegedly occurred in a DCYF licensed foster home, albeit the license is not longer active. Moreover, as Erica and Dionne are the children alleged to be at risk in the pending petitions, respondent is clearly a person responsible for their welfare."

(Transcript of April 12, 2001 pages 5, 6, and 7 – Exhibit 43)

48. Once the Department substitutes the allegations and files a petition it is up to the Court to determine whether removal of the child or other interim orders are appropriate.

(Transcript of April 12, 2001 page 8 – Exhibit 43)

49. The Court found that "DCYF's case is predicated upon statements made by Crystal to the child protective investigator. They are hearsay statements to be sure, yet permissible in probable cause hearings. They constitute "credible hearsay" if for no other reason than the original disclosures were made in a hospital setting, presumably for the purposes of diagnosis or treatment. These statements are deemed so reliable that they constitute an exception to the rule against hearsay evidence. Standing alone, prior to any possible

undermining of the case by respondent, DCYF has presented sufficient evidence to meet its threshold burden at a probable cause hearing."

(Transcript of April 12, 2001 page 9 – Exhibit 43)

50. On April 27, 2001, the Court entered an order reflecting its findings made on April 12, 2001 which states as follows:

**DECREE**

This matter came to be heard before Mr. Justice Paul Suttell on the 12th day of April, 2001 on the petition of the Department of Children, Youth and Families ("DCYF"), and after consideration thereon, it is hereby:

**FINDINGS OF FACT:**

1. That the Court finds that Crystal Jones is not a child as statutorily defined in the child abuse and neglect statute.
2. That the Court finds the Department of Children, Youth and Families had an obligation and authority under RIGL 40-11-1 ET-SEQ and RIGL 42-72-1 ET-SEQ to investigate because of the following reasons:
    a. Crystal Jones is a committed child under the care and custody of DCYF.
    b. Ricardo Hopkins was employed by Whitmarsh, a childcare facility.
    c. The alleged abuse was done in a DCYF licensed foster care placement
3. That the Court also finds Sarah Hopkins was a credible witness.
4. That Sarah testified that she was with Crystal Jones all the time which doesn't necessarily mean that Ricardo did not abuse Crystal but makes it less likely.

**ORDERED, ADJUDGED, AND DECREED:**

1. That respondent's motion to dismiss is denied.

2. That Ricardo Hopkins is allowed to return home; that either Stephanie or any able appropriate adult cleared by DCYF may supervise contact between father and child.
3. That Ricardo Hopkins is hereby restrained from having any unsupervised contract with any child who is a subject of the pending petitions.
4. That Ricardo Hopkins is further restrained and enjoined from exercising any form of physical discipline, including corporal punishment, on any child.
5. That the no contact order between Ricardo Hopkins and Dionne remains status quo.
6. That the Department is to have reasonable unannounced access to the home.
7. That this matter is continued for pretrial to April 26, 2001.
8. That the discovery is to be provided to the State.
9. That a witness list is to be provided by respondent.

(Decree of R.I. Family Court dated 4-27-2001 – Exhibit 44)

51. On May 21, 2001 counsel for Ricardo Hopkins sought a stay of the April 27, 2001 order which was denied by Judge Suttell that same day.
52. On May 18, 2001 counsel for Ricardo Hopkins filed a petition for *Writ of Certiorari* seeking to overturn the Family Court's order. The jurisdictional, due process, and other arguments made in the petition for *Certiorari* are the same as those made by the Plaintiff in his Motion to Dismiss in Family Court.

    (Petition for a *Writ of Certiorari* – Hopkins v. State of R.I. Supreme Court 01-197 Exhibit 45, supplement to Petition for a *Writ of Certiorari* – Exhibit 46)
53. On May 21, 2001 Hopkins filed an Application for Stay in the Supreme Court.

    (Application for Stay – Exhibit 47)

54. On May 23, 2001 the Supreme Court Duty Judge denied the Motion for Stay without prejudice.

(Order dated May 23, 2001 – Exhibit 48)

55. On December 5, 2003 Counsel for Ricardo Hopkins voluntarily dismissed his petition for *Writ of Certiorari,* with prejudice.

(Stipulation of Dismissal – Supreme Court no. 2001-197 – Exhibit 49)

56. Stays having been denied in both the Family and Supreme Court the Hopkins matter proceeded at trial on May 21, 2001, June 4, 2001, and June 6, 2001. On June 6, 2001, Counsel for Ricardo Hopkins made a Motion to Dismiss on the record. The Court reserved decision on the Motion on that date.

(Transcript of Family Court Proceedings June 6, 2001, at pages 52 through 59 – Exhibit 50)

57. On July 3, 2001 the Trial Justice gave his decision on Hopkins' Motion to Dismiss.

(Transcript of Family Court Proceedings July 3, 2001 – Exhibit 51)

58. On August 8, 2001 Justice Suttell entered a Decree based upon the Court's decision of July 3, 2001 which reads as follows:

**DECREE**

This matter came on to be heard before Mr. Justice Suttell on the 3rd day of July, 2001 on the petition of the Department of Children, Youth and Families, and after consideration thereon, it is hereby:

**ORDERED, ADJUDGED, AND DECREED:**

1. That after weighing the evidence adduced at trial, the Court cannot find with clear conviction that respondent sexually abused Crystal Jones two or three times a week over an eight year period.
2. That the allegations of neglect predicated upon Ms. Jones' assertions of sexual abuse must, therefore, fail.
3. That the Court finds, therefore, that the Department of Children, Youth and Families has presented sufficient evidence upon which the Court could find by clear and convincing evidence that respondent, Ricardo Hopkins, tied both Dionne's and Douglass' hands and feet as a form of punishment, and that he has struck both Dionne and Erika with a switch.
4. That the Court finds that there is no evidence that respondent father ever administered punishment cruelly, maliciously or with intent to harm. What crosses the line, however, is the binding of the children's hands and feet. This creates a great risk of physical and emotional harm to the children, and in my judgment, in appropriate and excessive.
5. That the Court finds that if, after respondent is allowed to present his case, the Department of Children, Youth and Families is able to sustain this allegation, it will have proven neglect by clear and convincing evidence.
6. That the petition may be dismissed as to Stephanie Morgan, and continued for trial as to Mr. Hopkins on the sole issue of inappropriate and excessive discipline.
7. That this case is continued to July 10, 2001 on that issue.

ENTERED as a Decree of this Honorable Court this 6th day of August, 2001.

(Family Court Decree 8/6/2001 – Exhibit 52)

59. On 8/6/01 the Family Court dismissed the remaining allegations against Hopkins.

    (Decree of Family Court entered 8/6/01– Exhibit 53)

60. Family Court retained Jurisdiction over Hopkins access/reunification with his son Dionne in the context of a petition pending involving Dionne's mother in the matter of Nalls, Dionne FC No.1996-2572-04.

    (Motion for Placement 9/4/2001 Hearing date 9/27/01 – FC No. 96-2572-04 – Exhibit 54)

61. Reunification was subject to Family Court approval which was withheld pending concurrence by therapist Haven Miles.

    (Decree regarding placement dated 10/2/01 FC No. 1996-2572-04 – Exhibit 55)

Respectfully Submitted,

Defendants,
By their attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Richard B. Woolley
Richard B. Woolley #1452
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2293
Fax: (401) 222-2995

## CERTIFICATION

I, the undersigned, hereby certify that I sent via facsimile and first class mail, postage pre-paid, a true copy of the within Defendants' Statement of Undisputed Facts on this 22nd day of June, 2006 to those indicated below:

Melissa L DiLorenzo

Joseph R. Daigle, Esq.
Gelfuso & Lachut Inc.
1193 Reservoir Avenue
Cranston, RI 02920