UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HOPKINS HOPKINS, Individually and as Parent and Next of Kin to DIONNE NALLS and ERICA HOPKINS, Plaintiffs, | |
| V. | C.A. NO. 04-373L |
| THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS; DEPARTMENT OF CHILDREN, YOUTH, & FAMILY, JAY G. LINDGREN, JR., Individually and in his capacity as Director of DCYF; THOMAS M. BOHAN, ESQ., Individually and in his capacity as Associate Director Child Welfare Services, KEVIN AUCOIN, Individually and in his Capacity as Chief Legal Services, SUZAN MORRIS, Individually, and in her Capacity as Senior Legal Counsel; PATRICIA PETRELLA, Individually and in her capacity as Legal Counsel to DCYF; ELLEN BALASCO, Individually and in her capacity as Legal Counsel to CASA; KAREN DEGENOVA, Individually and in her Capacity as a DCYF Investigator, Defendants. | |

OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Plaintiffs move this Honorable Court to Deny Defendants' Motion for Summary Judgment. In support of this Opposition, Plaintiffs file a Memorandum in Opposition

N:/clients/Hopkins.R/pleadings/Memo.in.opp.2.Sum.J.
JRD/070306/5

to Defendants' Motion, the Affidavit of Ricardo Hopkins, and the Statement of Undisputed Facts.

***WHEREFORE***, Plaintiffs pray that this Court enter an Order denying Defendants' Summary Judgment Motion.

REQUEST FOR HEARING

Plaintiffs request that the Court schedule a hearing in this matter not to last more than two hours.

Plaintiffs,

By Their Attorney,

Joseph R. Daigle

Joseph R. Daigle #5429
GELFUSO & LACHUT, INC.
1193 Reservoir Avenue
Cranston, RI 02920
Tel.: (401) 942-4300
Fax.: (401) 946-0970

**CERTIFICATION**

I hereby certify that a true and accurate copy of the within document was sent via U.S. mail, postage prepaid, on the 14 day of July, 2006, to:

Richard B. Woolley, Esq.
Special Assistant to the Attorney General
Civil Division
150 South Main Street
Providence, RI 02903

Joseph R. Daigle

N:/clients/Hopkins.R/pleadings/Memo.in.opp.2.Sum.J.
JRD/070306/5

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HOPKINS HOPKINS, Individually and as Parent and Next of Kin to DIONNE NALLS and ERICA HOPKINS, Plaintiffs, | |
| v. | C.A. NO. 04-373L |
| THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS; DEPARTMENT OF CHILDREN, YOUTH, & FAMILY, JAY G. LINDGREN, JR., Individually and in his capacity as Director of DCYF; THOMAS M. BOHAN, ESQ., Individually and in his capacity as Associate Director Child Welfare Services, KEVIN AUCOIN, Individually and in his Capacity as Chief Legal Services, SUZAN MORRIS, Individually, and in her Capacity as Senior Legal Counsel; PATRICIA PETRELLA, Individually and in her capacity as Legal Counsel to DCYF; ELLEN BALASCO, Individually and in her capacity as Legal Counsel to CASA; KAREN DEGENOVA, Individually and in her Capacity as a DCYF Investigator, Defendants. | |

MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

FACTS

On February 12, 2001, the Rhode Island Department of Children, Youth and Family ("DCYF") received a telephone notification from Butler Hospital indicating that a 19-

N:/clients/Hopkins.R/pleadings/Memo.in.opp.2.Sum.J.
JRD/070306/5

year-old woman, Crystal (a/k/a Krystal) Jones, had accused Plaintiff, Ricardo Hopkins ("Mr. Hopkins"), of sexually abusing her from 1988 to 1996. The abuse allegedly occurred when Jones and Mr. Hopkins were foster children in the same household.

Jones was well known to DCYF as she had been under their care, custody and control since early childhood. The DCYF records revealed that Jones had a history of sexual abuse prior to living with the Hopkins Family, along with substance abuse and serious mental and emotional problems.

On February 13, 2001, Jones' complaint was assigned to a novice DCYF investigator, Karen DeGenova (hereinafter "DeGenova"), for investigation. On the same date, Ms. DeGenova interviewed Ms. Jones regarding her allegations against Mr. Hopkins. Ms. DeGenova made no attempt to obtain corroboration of Ms. Jones' claims despite the fact that she knew of at least one possible source of corroborating information.[1] Instead, DeGenova immediately went to Mr. Hopkins' home to confront him.

From the time he first opened the door, Mr. Hopkins sensed hostility and condescension from Mr. DeGenova. (See

---

[1] Jones told DeGenova that Mr. Hopkins had been investigated in the past for sexually molesting a male foster child as well as hit niece, Sarah Hopkins. Much later, after DeGenova had succeeded in removing Mr. Hopkins children from his custody, DCYF's investigation revealed that Mr. Hopkins' niece denied any molestation and a review of police and DCYF records revealed no prior complaints or incidents of sexual abuse involving Mr. Hopkins.

the Affidavit of Ricardo Hopkins.) Upon gaining entry into the Hopkins home, Ms. DeGenova informed Mr. Hopkins about the allegations of sexual abuse. Mr. Hopkins' mother, Nina, his girlfriend Stephanie Morgan, and his three-year-old daughter Erica were also in the home at the time. Nina attempted to refute the allegations with her own personal knowledge of Jones' history in the Hopkins' household, but Degenova was dismissive of her comments.

Mr. Hopkins denied abusing Jones. DeGenova then turned the conversation to how he treated Erica. During DeGenova's questioning of Mr. Hopkins, he admitted to using a "switch" to punish Erica on one occasion. Degenova then met with Erica in private for five minutes. Although Erica did not confirm any inappropriate sexual touching by her father, she allegedly confirmed that he had used a switch to hit her. Based on this, Ms. Degenova left the Hopkins home, returned with two Foster police officers, and forced Mr. Hopkins to leave his home.

No probable cause existed to substantiate Jones' allegations that Mr. Hopkins had sexually abused her. No probable cause existed to substantiate allegations that Mr. Hopkins had physically abused Erica. Unlike in other well-settled cases within this jurisdiction in which the reasonableness of DCYF's removal of a child from a parents

custody has been upheld based upon initial judgments of DCYF investigators, Ms. DeGenova had no independent corroboration of physical abuse: there were no eyewitnesses, no physical manifestations of abuse, and Erica did not appear to be upset, afraid or in any distress. DeGenova relied solely on her five-minute interview of a three-year-old and on her own preconception of Mr. Hopkins' guilt.

At the time of the investigation, Mr. Hopkins was employed as a counselor at two facilities for adolescents, licensed by the State of Rhode Island. Within a few days of being forced to leave his home, someone at DCYF contacted Mr. Hopkins' employers and informed them that he had been "indicated". Mr. Hopkins was immediately terminated from both jobs.

On February 20, 2001, DCYF indicated additional allegations of abuse and neglect against Mr. Hopkins, including an indication of "other neglect" alleging that his son Dionne (who resided with his mother Mary Nalls and her mother Izola Ricketts) and Erica were in danger of being sexually abused by Mr. Hopkins "based upon" the allegations made by Jones. (Nalls and Ricketts had their own selfish reasons for wishing to see Mr. Hopkins indicated. Set the Affidavit of Mr. Hopkins.)

On or about March 1, 2001, two weeks after the initial complaint, Mr. Hopkins was arraigned in Family Court at which time he requested a probable cause hearing. In April 2001, the Family Court ruled that Mr. Hopkins was not a "risk of harm to Erica, such that it is necessary to remove him from his home pending final resolution". Though by this time the weakness of Defendants' case against Mr. Hopkins was apparent, DCYF's counsel, Defendant Patricia Petrella, objections, attempted to stay the Court's decision to allowing Mr. Hopkins to return home, with the proviso that all contact with Erica must be supervised.

After the probable cause hearing concluded, the Family Court ruled that DCYF had failed to present clear and convincing evidence that Mr. Hopkins had sexually abused Jones, had sexually abused Dionne or Erica or that they were in danger of being sexually abused by Mr. Hopkins. Since no probable cause existed, all of the aforementioned petitions were dismissed by the Family Court as of July 30, 2001 by an Order dated August 8, 2001.

It took another two months after the trial ended before Mr. Hopkins was awarded unsupervised visitation with his son Dionne. The delay was caused by DCYF's insistence that Mr. Hopkins follow their timetable and plan for reunification. On or about October 25, 2001, DCYF granted

Mr. Hopkins's administrative appeal and amended their records to indicate all charges were "unfounded".

Throughout DCYF's prosecution of this matter against Mr. Hopkins, DCYF, its legal counsel and its casehandlers, refused to back away from their positions regarding Mr. Hopkins guilt even in the face of clear evidence that the original claims of Ms. Jones were unfounded and that DeGenova had violated DCYF investigative procedure and far exceeded her authority. DCYF's intransigence is irrational in light of what was known about the case. For instance, in April/May 2001, Mr. Hopkins filed an interlocutory appeal with the Rhode Island Supreme Court arguing, *inter alia*:

1. That DCYF was not authorized to conduct and investigation under the facts of the case because Ms. Jones was not a "child", Mr. Hopkins, was not a person responsible for Jones' care, and Jones was in not imminent danger from him;

2. That DCYF could not use subsequently obtained evidence to support its probable cause finding and any evidence derived from the initial illegal investigation was "fruit of the poisonous tree";

3. That by exceeding its powers and ignoring statutory limits on its authority, then refusing to take corrective action, Defendants had violated Mr. Hopkins' rights and denied him due process.

Though the Supreme Court found the appeal to be premature and therefore did not grant the relief Plaintiff requested, after the hearing, Justice Goldberg took the unusual step of informing counsel of her doubts about its case. Kevin Aucoin, Associate Director/Chief of Legal Services for DCYF admitted that Justice Goldberg had voiced her concerns but, despite these comments, DCYF refused to relent and continued to prosecute Mr. Hopkins.

## II. COUNTS AGAINST DEFENDANTS:

### A. DISCRIMINATION AND VIOLATION OF CIVIL RIGHTS:

Defendants denied Plaintiffs their right to equal opportunity and to be free from discrimination as guaranteed by the United States Constitution. DCYF's practices discriminate against certain protected classes, such as Plaintiffs', based on race and/or color. Moreover, Defendants knew or should have known that minorities within the DCYF system are not afforded equal protection under the

law resulting in unjust discrimination. (See Plaintiffs' Statement of Undisputed Facts.)

B. DUE PROCESS:

Defendants, acting under color of state law and color of their authority, deprived Plaintiffs of certain property interests protected by the United States Constitution without substantive and procedural due process of law, including prior notice and an opportunity to be heard.

Plaintiff has a "liberty" interest in parenting his children that is protected by the United States Constitution. The United States Supreme Court has stated "that it has little doubt that the Due Process Clause would be offended "[i]f a State were to attempt the breakup of a natural family, over the objections of the parents and their children without some showing of unfitness and for the sole reason that do so was thought to be in the children's best interest." Quilloin v. Walcott, 434 US.S 246, 98 S.Ct. 549, 555, 54 L.Ed.2d 511, 520 (1978)(quoting Smith v. Organization of Foster Families, 431 U.S. 816, 862—63, 97 S.Ct. 2094, 2119, 53 L.ed.2d 14, 47(1977). Once a petition is filed alleging abuse or neglect based on indicated findings, DCYF regulations fail to provide adequate procedures for an immediate appeal. This

regulation flagrantly violates Mr. Hopkins's right to due process.

Mr. Hopkins's "liberty" interest in pursuing his occupation and avocation is protected by the Constitution of the United States. By causing the termination of Mr. Hopkins's employment without due process of law, Defendants deprived Mr. Hopkins of his right to pursue his occupation.

Further, Mr. Hopkins had a "liberty" interest in protecting his name and reputation in the community, which is protected by the United States Constitution. By classifying Mr. Hopkins as a sex abuser without due process of law, Defendants attached a badge of infamy to his name and otherwise damaged his reputation.

C. TORTIOUS INTERFERENCE/CONTRACTUAL RELATIONSHIPS:

Mr. Hopkins had employment with two facilities licensed by the State of Rhode Island. Plaintiffs note that, for the purpose of this motion, Defendants do not contest the merits of Plaintiffs' claim to recover under this theory of liability but, rather, rely on procedural defenses including, statute of limitations, *Res Judicata* and various immunity defenses. Plaintiffs respond below.

D. DEFAMATION:

The Defendants published and circulated false, defamatory, malicious and libelous statements concerning Mr. Hopkins. By naming Mr. Hopkins as a sex offender, Defendants have attached a badge of infamy to his name and otherwise damaged his reputation.

Again, Defendants do not contest the merits of Plaintiffs' claim to recover under this theory of liability but, rather, rely on procedural defenses including, statute of limitations, *Res Judicata* and various immunity defenses.

E. WRONGFUL INTRUSION:

Pursuant to R.I.G.L. §9-1-28.1 and the United States Constitution, Plaintiffs have the right to be free from unreasonable intrusion into their private lives. Defendants were without legal authority to violate this expectation.

F. NEGLIGENCE:

Defendants had a duty to protect and refrain from interfering with Mr. Hopkins' fundamental interest in the care, custody and management of his children. The negligence of Defendants includes negligent hiring/ supervision of Ms. DeGenova, Further, Defendants owed a "special duty" to Plaintiffs. Their "egregious conduct" toward them, both during the investigation and the litigation of this matter, expose Defendants to liability.

## ARGUMENT

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment is granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must examine the record in the light most favorable to the nonmoving party and indulge all reasonable inferences in that party's favor. Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

### SPECIFIC OBJECTIONS TO DEFENDANTS' CLAIMS

#### I. Plaintiffs May Proceed With Their Claims Under 42 U.S.C. 1983 Claims Against Defendants DCYF And Its Officers And Agents In Their *Individual* Capacities For Acts The Committed In Their *Official* Capacities Under Hafer V. Melo

Plaintiffs contend that Defendants are liable to them personally under 42 U.S.C. 1983[2] because they acted under color of law to deprive Plaintiffs of their constitutionally protected rights. The very purpose of §1983 is to "interpose the...courts between States and the people, as guardians of the people's federal rights...to

[2] § 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . .

protect the people from unconstitutional action under color of state law, whether that action be executive, legislative, or judicial" Patsy v. Board of Regents of Florida, 457 U.S. 496, 503, 102 S.Ct. 2557, 2561, 73 L.Ed.2d 172, 179 (1982).

The first question in the analysis of a §1983 action is whether a person has been deprived of rights secured by the Constitution and laws of the United States. In this instance, the question can be answered in the affirmative. It is well established that the right to parent a child is a constitutionally protected right. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents..." Santosky v. Kramer, 455 U.S. 745,753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982).

Next, Defendants' actions were a knowing violation of clearly established constitutional and statutory rights. DCYF claimed to have acted pursuant to R.I.G.L. §40-11-7 (concerning Abused and Neglected Children). However, that statute clearly states that in order to initiate an investigation there must be a "reasonable cause to believe that abuse exists." In the case at hand, the alleged abuse had ended five years prior to the complaint. Additionally,

R.I.G.L. §40-11-2(2) defines a child as "a person under the age of eighteen". Jones was nineteen-years-old when she made her allegations regarding Mr. Hopkins. Although, Defendants knew, or should have known, that they lacked the statutory and legal authority to initiate and conduct an investigation based on Jones' allegations, they did so in violation of their own regulations and procedures.

Additionally, the statements used by Defendants to establish probable cause were unreliable and/or obtained illegally. Utilizing said statements, the Defendants coerced and pressured Mr. Hopkins to leave his home when they knew, or should have known, said allegations were based on unfounded, unreliable and unsubstantiated claims. As a result of the foregoing, Plaintiffs have been deprived of equal protection under the law and other constitutional rights.

In the case of Hafer v. Melo, the United States Supreme Court unanimously held that state officials may be held liable personally for damages in section 1983 claims challenging actions taken in their official capacities. 502 U.S. 21, 112 S.Ct. 358 (1991). In that case, the Court explicitly addressed the Defendant's interpretation of Will v. Michigan Department of State Police, (491 U.S. 58, 109 S.Ct. 2304 (1989)) (which is virtually the same

interpretation that Defendants in this matter have advanced) for the proposition that state officials "acting in their official capacities" are outside the class of persons subject to liability under section 1983. The Hafer Court drew a distinction between the capacity in which the state officer is sued and the capacity in which he or she inflicted the alleged injury:

> The distinction between official-capacity and personal capacity suits is more than a "mere pleading device" . . . State officers sued for damages in their official capacity are not persons [subject to liability under 1983] because they assume the identity of the government that employs them . . . By contrast, officers sued in their personal capacity come to court as individuals.

Id. at 27. Therefore, even if Defendants are correct in asserting that they cannot be sued in their official capacities under 1983, the may still be sued in their individual capacities for acts they performed in there official capacities.

The Supreme Court has said that neither a state nor its officials when sued in their official capacities is a "person" for purposes of 1983 and, therefore, they are immune from suit under 1983. Will v. Michigan, 491 U.S. 58, 109 S.Ct. 2304. However, whether a political subdivision or agency of a State (like DCYF) shares the

same protection requires an analysis of the agency's relationship to the state. (See the following discussion.)

II. Plaintiffs' 42 U.S.C. 1983 Claims Against The State Of Rhode Island And Its Named Officers And Employees In Their Official Capacities Is Allowed Under The Eleventh Amendment

Hafer confirmed the principal that damage actions instituted against state officers in their personal capacities are not barred by the Eleventh Amendment. "Insofar as [plaintiffs] seek damages against [defendants] personally, the eleventh amendment does not restrict their ability to sue in federal court." At 31.

DCYF is also subject to suit under the Eleventh Amendment if the Court decides that, by DCYF's participation as a party in the case, the real party in interest is not the State of Rhode Island. In making the determination of whether the State is the real "party in interest", there are two principal considerations:

1. The autonomy of the agency.

The greater the autonomy of the agency, the less likely it will be treated as the state for Eleventh Amendment purposes. R.I.G.L. § 42-72-5 sets forth the powers and scope of DCYF's activities. Setting them forth

verbatim would take up several pages of this brief[3] but, in summary, the Director is given authority to plan, develop and evaluate a "comprehensive and integrated statewide program of services." DCYF is allowed to form its own programs and promulgate it own procedures, rules and

---

[3] Some of the more important provisions are set forth here:

"(a) The department is the principal agency of the state to mobilize the human, physical and financial resources available to plan, develop, and evaluate a comprehensive and integrated statewide program of services designed to ensure the opportunity for children to reach their full potential. The services include prevention, early intervention, out-reach, placement, care and treatment, and after-care programs; provided, however, that the department notifies the state police and cooperates with local police departments when it receives and/or investigates a complaint of sexual assault on a minor and concludes that probable cause exists to support the allegations(s). The department also serves as an advocate for the needs of children.

(b) To accomplish the purposes and duties, as set forth in this chapter, the director is authorized and empowered:

(1) To establish those administrative and operational divisions of the department that the director determines is in the best interests of fulfilling the purposes and duties of this chapter; * * *

(4) To establish, monitor, and evaluate protective services for children including, but not limited to, purchase of services from private agencies and establishment of a policy and procedure manual to standardize protective services; * * *

(7) To license, approve, monitor, and evaluate all residential and non-residential child care institutions, group homes, foster homes, and programs; * * *

(11) To establish procedures for reporting suspected child abuse and neglect pursuant to chapter 11 of title 40; * * *

(12) To promulgate all rules and regulations necessary for the execution of departmental powers pursuant to the Administrative Procedures Act, chapter 35 of title 42; * * *

(15) To represent and act on behalf of the state in connection with federal grant programs applicable to programs for children in the functional areas described in this chapter; * * *

(16) To seek, accept, and otherwise take advantage of all federal aid available to the department, and to assist other agencies of the state, local agencies, and community groups in taking advantage of all federal grants and subventions available for children; * * *

(17) To review and coordinate those activities of agencies of the state and of any political subdivision of the state which affect the full and fair utilization of community resources for programs for children, and initiate programs that will help assure utilization; * * *

(21) To establish fee schedules by regulations for the processing of requests from adoption placement agencies for adoption studies, adoption study updates, and supervision related to interstate and international adoptions. The fee shall equal the actual cost of the service(s) rendered, but in no event shall the fee exceed two thousand dollars ($ 2,000)."

regulations. It handles its own administration and may purchase services from private agencies. It may unilaterally deal with federal agencies with regard to federal grant programs and federal aid, and it may raise revenue to offset costs for services it provides.

> 2. What is the source of the funds that would be used to any monetary judgment? (Hess v. Port Authority Trans-Hudson Corp, 513 U.S. 30, 115 S.Ct. 394 (1994).)

The majority of jurisdictions have found that, when the money to pay a judgment would come from the state treasury by direct operation of judgment, the Eleventh Amendment applies. In contrast (as is set forth above), DCYF may access federal grant programs and federal aid and may raise revenue to offset costs for services it provides.

Finally, in making its determination as to who the real party in interest is, Courts are to be guided by state law. (Mt. Healthy City School District v. Doyle, 429 U.S. 274, 97 S.Ct. 568 (1977).)

### III. Plaintiffs' Claims Against The Defendants In Their Individual And Official Capacities Are Not Barred By The Statute Of Limitations

Plaintiffs Dionne Nalls and Erica Hopkins are minors and, as such, Defendants' Statute of Limitations arguments do not apply to them. R.I.G.L. 9-1-19.

Defendants' defenses to the claims for defamation, negligence and intentional interference with contractual relationships hinge on the three-year limitations statutes for those claims. However, Rhode Island recognizes the "discovery" rule. "[T]he heart of the discovery rule is that the statute of limitations does not begin to run until the plaintiff 'discovers, or with reasonable diligence should have discovered, the wrongful conduct of the [defendant].'" Supreme Bakery, Inc. v. Bagley, 742 A.2d 1202, 1204 (R.I.2000) (quoting Benner v. J.H. Lynch & Sons, Inc., 641 A.2d 332, 337 (R.I.1994)).

> The reasonable diligence standard is based upon the perception of a reasonable person placed in circumstances similar to the plaintiff's, and also upon an objective assessment of whether such a person should have discovered that the defendant's wrongful conduct had caused him or her to be injured. If a reasonable person in similar circumstances should have discovered that the wrongful conduct of the defendant caused her injuries as of some date before the plaintiff alleged that she made this discovery, then the earlier date will be used to start the running of the limitations period.

Martin v. Howard, 784 A.2d 291, 300 (R.I. 2001)[emphasis added] (citing Anthony v. Abbott Laboratories, 490 A.2d 43, 47 (R.I.1985)).

Defendants' argument that the clock started ticking on Mr. Hopkins' claims between the time when the investigation began and the July 3, 2001 hearing is incorrect both

N:/clients/Hopkins.R/pleadings/Memo.in.opp.2.Sum.J.
JRD/070306/5

factually and legally. First, as far as Mr. Hopkins' tort claims are concerned, that date is without significance. The chronology of events Plaintiffs have provided clearly show a chain of tortuous behavior by Defendants which commenced before the date of that hearing and continue long after it.

As far as establishing a cause of action on his constitutional and federal claims, July 3, 2001 was not the important date. It was not until July 30, 2001, that Judge Suttell held the final hearing on the merits. Even then, the exact meaning of his decree had not been worked out. It was not until August 8, 2001 that his Orders were entered.

Defendants continued to interfere with Mr. Hopkins parental rights even after the Final Decrees had entered. Although DCYF had no petitions pending against Mr. Hopkins and all the charges had been dismissed, DCYF continued to interfere with Mr. Hopkins attempts to obtain custody of his son, Dionne. Even though Dionne was without adequate custody at the time and though Mr. Hopkins had previously shared custody of Dionne with Mary Nalls, after August 6, 2001, he was denied custody of Dionne and was forced to file a Motion for Placement on September 4, 2001. (See

Motion for Placement, attached hereto as Exhibit "1.") He was not granted custody until the end of September 2001.

Anther example of the ongoing damages that Defendants' action had came in January 2002. After losing both of his jobs, Mr. Hopkins was forced to collect unemployment benefits from the Rhode Island Department of Employment and Training. In January 2002, DET notified Mr. Hopkins that he was required to reimburse the Department for over $11,000 in benefits paid to him. The reason - his employers had reported that Mr. Hopkins was terminated because he had been "indicated on a finding that disqualifies you from working with youth. Since you can no longer perform the duties of your job due to your own actions, it is determined that you were discharged for misconduct." (Emphasis added.) DLT demanded the money back. (A copy of the notice is attached to the Affidavit of Mr. Hopkins.) Although Mr. Hopkins has requested an appeal, as of this filing this matter has not been resolved in his favor.

Yet another example: though Mr. Hopkins initially lost his employment in March 2001, it appeared that the only obstacle to his returning to those jobs was the indication by DCYF. After he had been exonerated from the charges against him, Mr. Hopkins learned that in order to return to

his employment, he needed to have the indication expunged from his record. It was not until he did this that he attempted to return to his jobs at Whitmarsh House and Communities for People. One former employer insisted on treating him as a new employee (despite his previous excellent work record) and the other refused to have anything to do with him. (See the Affidavit of Mr. Hopkins.)

IV. The Named Defendants Are Not Entitled To Absolute Judicial Immunity In This Action

The absolute Judicial Immunity Defendants claim is available, if at all, only when the prosecutor is performing functions that require prosecutorial discretion - it does not extend to functions that are merely administrative or investigative. Wilson v. Brock, 2002 DNH 137 (D.N.H 2002)(citing Guzman-Rivera v. Rivera-Cruz, 55 F.3d 26, 29 (1st Cir. 1995).) Since Defendants have consistently maintained that were bound by statute and regulation to prosecute Mr. Hopkins in this matter once he had been indicated, their reliance on this doctrine is misplaced.

V. The Defendants Are Not Entitled To Absolute Prosecutorial Immunity For Actions Taken In This Case

The case upon which Defendants primarily rely for the proposition that they are protected by prosecutorial

immunity, Thomason v. SCAN Volunteer Servs., 85 F.3d 1365, has not been adopted by the First Circuit. The Court should not adopt the holding of Thomason, because it essentially vindicates child care workers who bring custody proceeding based upon information they know to be false. Id. at 1372. Should the Court choose to adopt Thomason, however, its application should be limited to Defendant DeGenova, the caseworker who filed the proceedings in question and should be further limited only to her actions directly relating to the filing of the case, not to her investigation.

VI. The Defendants Are Not Entitled To Qualified Immunity

The Qualified Immunity Privilege set forth in R.I.G.L. § 40-11-4 shields people from liability when, in good faith, they report suspected child abuse of participate in judicial proceedings. The "good faith" requirement is subjective. Only if an abuse-reporter can prove that he or she had a reasonable suspicion of abuse will he or she be granted immunity from suit. If there is a genuine issue of material fact as to whether the person acted in good faith, the question must be decided at trial by the jury. Wojcik ex rel, Wojcik v. Town of N. Smithfield, 874 F. Supp. 508 (D.R.I. 1995), aff'd, 76 F.3d 1 (1st Cir. 1996.)

The test for establishing Qualified Immunity has three parts:

> The threshold question is whether the plaintiffs have established a constitutional violation. The second question deals with fair warning; it asks whether the law was clearly established at the time of the constitutional violation. The final question is whether a reasonable official, situated similarly to the defendant(s), would have understood that the conduct at issue contravened the clearly established law.

Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003)(citations omitted.) A plaintiff is not required to show that either the particular conduct complained of or some materially indistinguishable conduct has previously been found unlawful. "The relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law. Id. at 28.

The case of Hatch v. Dep't for Children is instructive. 274 F.3d 12, 23 (1st Cir. 2001). In that case, Appellant sued DCYF for taking custody of his adopted son after he showed up at school with visible injuries and subsequently informed the school nurse that his injuries were caused by his father. Id. at 17. Appellant filed suit against DCYF seeking monetary damages under §1983 for, *inter alia*, DCYF's alleged violation of the appellant's

N:/clients/Hopkins.R/pleadings/Memo.in.opp.2.Sum.J.
JRD/070306/5

constitutional rights to familial integrity. DCYF moved for summary judgment, arguing that the Eleventh Amendment protects states (and, therefore, state agencies) from section 1983 liability. The district court granted this motion.

On appeal, the First Circuit applied the three-step Qualified Immunity analysis. First, it determined whether the plaintiff has alleged the violation of a constitutional right. Id. at 20.

> The interest of parents in the care, custody, and control of their children is among the most venerable of the liberty interests embedded in the Constitution. As such, it is protected by the Due Process Clause. We must go further, however, because a right cannot be stated at so high a level of generality for the purposes of a qualified immunity inquiry. In this vein, the law recognizes that the protection afforded to the parents' interest must be balanced against other valid interests, particularly the best interests of the child and the interest of society in the maturation of children as future citizens.

Id. (citations ommited.) The Court found a protected interest.

Applying the second step of the Qualified Immunity analysis, the Appeals Court then noted that a trial Court must determine the "contours" of a particular right at a given point in time and advised that an inquiring court must look not only to Supreme Court precedent but to all available case law. Id. at 20. "Given the widespread

agreement that has developed as to the applicable legal regime, we conclude that, in the spring of 2000, an objectively reasonable case worker surely would have believed that taking temporary custody of a child prior to a hearing would violate the parents' interest in the child's care, custody, and control if he acted without a reasonable suspicion of child abuse (actual or imminent)." Id. at 24 [emphasis added, internal citations omitted]. Therefore, on February 13, 2001, an objectively reasonable caseworker would have know that removing Erica Hopkins from her father's custody prior to a hearing without a reasonable suspicion of child abuse, would violate Mr. Hopkins interest in her care, custody and control.

The final step of the Qualified Immunity Analysis deals with the facts of the particular case. Id. at 25. The question is whether the caseworker had reliable information, sufficient to support a reasonable suspicion of abuse, when she removed the child from the parent's custody. Id. An official is entitled to qualified immunity as long as "he had an objectively reasonable basis for believing that his conduct would not abridge the rights of others." Id. at 26, (citing Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999)). As in the matter before this Court, the appellant in Hatch argued that the caseworker

did not investigate the matter fully before taking the child into custody. The First Circuit noted that there was no requirement that the caseworker had an obligation to investigate fully once he had a reasonable basis to suspect abuse. Id. at 24. The Court then addressed whether such reasonable basis existed and found that it did. But the Hatch Court's findings regarding the caseworker's basis are easily distinguished from the facts in this case. The appellant in Hatch had argued that the caseworker lacked a reasonable basis for his suspicions because he relied primarily on hearsay information regarding the abuse. Id. at 24. But the Court disagreed:

> When he took custody, [the case worker] knew, at the very least, that two responsible faculty members (the principal and the school nurse) took John's claim of abuse seriously; that John had repeated that claim to the police; that he bore marks consistent with his claim; that the boy had expressed fear for his safety should he be forced to return home; that he was complaining of headaches and dizziness; and that a neutral physician, after examining him, had reported that his injuries were consistent with abuse and had placed him under a "physician's hold." We believe that this was more than sufficient to raise a reasonable suspicion of abuse (and, thus, to justify a temporary assumption of custody). . . .

Id. at 24-25. The Hatch Court also cited statements of the child's doctor providing an expert opinion finding that the injuries were consistent with abuse. Id.

In comparison, DeGenova did not seek corroboration of Jones' allegations. She did not speak with Mr. Hopkins or his niece, who Jones had claimed (incorrectly) would corroborate her story. Upon arriving at the Hopkins home, she apparently abandoned her quest for evidence in support of Crystal Jones' claim and focused on Mr. Hopkins admission that he had once punished Erica by tapping the palms of her hand with a "switch." DeGenova then interviewed Erica Hopkins, age three, for five minutes before concluding that there was sufficient evidence to form reasonable suspicion of abuse. She did so even though there were no complaints regarding abuse (hearsay or otherwise), no eyewitnesses to the alleged abuse, no physical signs of abuse, and no medical experts opinion to back up her suspicions. She did not even report that the child seemed distressed, afraid or emotional at any time while she was in the home.

Degenova, therefore, did not have a reasonable basis to support her suspicions of abuse, and Qualified Immunity does not apply.

<u>QUALIFIED IMMUNITY AS TO OTHER DEFENDANTS</u>:

Jay G. Lindgren, Jr., Individually and in his capacity as Director of DCYF; Thomas M. Bohan, Esq., Individually and in his capacity as Associate Director Child Welfare

Services, Kevin Aucoin, Individually and in his Capacity as Chief of Legal Services at DCYF:

It is clearly established that a supervisor may be responsible for the constitutional violations of a subordinate when those violations are caused in part by a failure to train. City of Canton v. Harris, 489 U.S.378, 390. The need for training is "obvious" where there was foreseeable serious consequences that could result from the lack of instruction. Id. at 390. DeGenova had been an investigator for less than three months when she was assigned to investigate Crystal Jones' claims. Her investigation of this matter is rife with procedural violations, poor judgment and complete indifference to the rights and welfare of Plaintiffs. DCYF failed to adequately train DeGenova for the assignment, and failed to monitor her handling of the matter during the investigation.

Patricia Petrella, Individually and in her capacity as Legal Counsel to DCYF:

Despite overwhelming evidence of the poor investigation conducted by DeGenova, Petrella continued to prosecute this matter relentlessly.

Ellen Balasco, Individually and in her capacity as Legal Counsel to CASA:

Ms. Balasco raised groundless objections to questions asked by Plaintiffs' counsel at the deposition of Ms. Jones, effectively delaying completion of the deposition for several weeks.

VII. *Res Judicata* and Collateral Estoppel do not bar this action

The premise of Defendants argument for dismissal based on *Res Judicata*/Collateral Estoppel seems to largely depend upon the fact that after essentially winning on every charge brought against him, Mr. Hopkins failed to appeal the finding of Judge Suttell at the July 3, 2001 hearing (memorialized in the August 8, 2001 Order) stating:

> 3. That the Court finds, therefore, that the Department of Children, Youth and Families has presented sufficient evidence upon which the Court could find by clear and convincing evidence that respondent, Ricardo Hopkins, tied both Dionne's and Douglas' hands and feet as a form of punishment, and that he has struck both Dionne and Erika [sic] with a switch.
>
> * * *
>
> 5. That the Court finds that if, after respondent is allowed to present his case, the Department of Children, Youth and Families is able to sustain this allegation, it will have proven neglect by clear and convincing evidence.

[Emphasis added.] It is apparent from the wording of this Order that the Court was not making factual findings. The Judge had not heard Mr. Hopkins' evidence. Defendants are

forgetting that at a hearing held on July 30, 2001, Mr. Hopkins was cleared of charges that he physically abused his children. Defendants further fault Mr. Hopkins for failing to press his appeal of Judge Suttell's April 2001 Decree. Having spent over $60,000 in attorneys' fees and prevailing on virtually all issues, it is difficult to imagine why he would do so.

As for the minor Plaintiffs, Erica and Dionne - neither actively participated in the Family Court proceedings and so neither Collateral Estoppel nor *Res Judicata* applies to them. The fact that a *Guardian ad Litem* may have represented them through part of the proceedings in no way establishes that the Guardian was on notice that he should be seeking to protect their constitutional rights against DCYF. Given the nature of the proceedings and the allegations against Mr. Hopkins, it seems highly unlikely that such issues would even be considered by the GAL.

VIII. Punitive Damages may be awarded under the facts of this case

Even under the standard set forth in Defendants' Memorandum, Plaintiffs have pled sufficient facts that, if proved at trial, will entitle them to punitive damages. "Punitive damages may be assessed in a § 1983 action "when

the defendant's conduct . . . involves reckless or callous indifference to the federally-protected rights of others. Smith v. Wade, 461 U.S. 30, 56 (1983).

The United States Supreme Court has stated "that it has little doubt that the Due Process Clause would be offended "[i]f a State were to attempt the breakup of a natural family, over the objections of the parents and their children without some showing of unfitness and for the sole reason that do so was thought to be in the children's best interest." Quilloin v. Walcott, 434 US.S 246, 98 S.Ct. 549, 555, 54 L.Ed.2d 511, 520 (1978)(quoting Smith v. Organization of Foster Families, 431 U.S. 816, 862–63, 97 S.Ct. 2094, 2119, 53 L.ed.2d 14, 47(1977). DeGenova found Ricardo Hopkins to be an imminent threat to Erica without any evidence or wrongdoing and based solely on her personal suspicions and prejudices. Should Plaintiffs' substantive claims survive summary judgment, they ask that the Court not deprive them of the ability to argue to a jury that DeGenova's acts show reckless or callous indifference to their constitutional rights, as well as their health and safety.

IX. Defendants in their individual capacities are not entitled to the Defenses of Qualified Immunity, Prosecutorial Immunity and Judicial Immunity with

Respect to Plaintiffs' Rhode Island Constitutional Claims

Defendant's owed a special duty to Plaintiffs. Their reckless conduct toward them prevents Defendants from relying on Qualified Immunity.

X. Sovereign Immunity does not bar Plaintiffs Rhode Island Constitutional Claims Against the State of Rhode Island and the Official Capacity Defendants.

To the extent that Defendants' actions exceeded their statutory authority, Sovereign Immunity does not apply. (See, supra.)

XI. Plaintiffs may rely on statistics to prove their claim that they were denied Equal Protection under the laws

Plaintiffs object to this Paragraph of Defendants' Summary Judgment Memorandum and ask the Court to Strike it because it raises an issue that is not appropriately address in a Motion for Summary Judgment. The argument asks the Court to rule on the admissibility of evidence, not on whether a factual issue exists as to whether Plaintiffs may bring a claim asserting that they have been denied Equal Protection of the Laws.

For the record, Mr. Hopkins has stated under oath that he found Ms. DeGenova to be openly hostile to him from the moment they first met and that he sensed that this was at

least in part racially motivated. (See Affidavit of Mr. Hopkins.) He has further testified, and the evidence supports his assertion, that even after he had been cleared of all charges, DCYF's actions interfered with his attempts to gain custody of Dionne. Finally, Plaintiff has submitted statistical evidence demonstrating that, with regard to children exiting foster care in Rhode Island, Black children were reunified with their parents 58.9% of the time in 2001, in comparison with Whites, 70.4%, and Asians,70.8%. (Plaintiffs are compiling additional statistical evidence that they believe will further evidence of disparate treatment based on race at DCYF.)

Statistical evidence is frequently used in Disparate treatment cases under Title VII. Plaintiffs assert that this type of evidence should be admissible in their case.

## CONCLUSION

For the forgoing reasons, Defendants' Motion for Summary Judgment should be denied.

Plaintiffs,

By Their Attorney,

Joseph R. Daigle #5429
CELFUSO & LACHUT, INC.
1193 Reservoir Avenue
Cranston, RI 02920
Tel.: (401) 942-4300
Fax.: (401) 946-0970

## **CERTIFICATION**

I hereby certify that a true and accurate copy of the within document was sent via U.S. mail, postage prepaid, on the 14 day of July, 2006, to:

Richard B. Woolley, Esq.
Special Assistant to the Attorney General
Civil Division
150 South Main Street
Providence, RI 02903

N:/clients/Hopkins.R/pleadings/Memo.in.opp.2.Sum.J.
JRD/070306/5

STATE OF RHODE ISLAND
PROVIDENCE, SC

FAMILY COURT
JUVENILE DIVISION

IN RE ERICA HOPKINS :
IN RE DIONNE NALLS :
STATE OF RHODE ISLAND :

VS. :

RICARDO HOPKINS :

FILE NO. 01-398-1
P/NG 01-000350

FILE NO. 96-2572-4
P/NG 01-000329

**MOTION FOR PLACEMENT**

Now comes the Respondent in the above-entitled matter and hereby states as follows:

1. On the 27th day of June, 2001, DCYF filed an Affidavit and Request for Ex-Parte Relief for Change of Placement regarding Dionne Nalls.

2. DCYF's aforementioned motions were heard on the 6th day of July, 2001, Justice Suttell presiding.

3. Counsel for the Respondent made a request at that time for Dionne Nalls (Respondent's biological son) to be placed in his immediate custody.

4. The aforementioned request was denied and the matter was set for trial on the 4th day of September, 2001.

5. At that time, counsel for the Respondent again requested that Dionne Nalls be placed with his father.

6. That request was once again denied and counsel for the Respondent was instructed to file a motion in this regard.

7. The Respondent is the biological father of Dionne Nalls and is a fit and proper parent.

8. There are no DCYF petitions pending naming the Respondent as a party, and all prior charges have been dismissed.

9. The Respondent has been separated from his son due to the actions of DCYF.

10. The Respondent has shared custody and placement of his son, Dionne Nalls, by prior order of this Court.

11. That up until the time DCYF intruded into this family, Dionne Nalls lived with his father at least four days of every week.

12. That the Respondent took custody of his son on at least one occasion when Mary Nalls abandoned her children.

13. That Mary Nalls failed to complete a substance abuse evaluation, failed to appear at the last court appearance, regularly abandons her children, and does not contribute to the support of her children.

14. That Izola Ricketts is elderly, in poor health and by her own admission is unable to care for five small children.

15. That recently Izola Ricketts failed to provide adequate care for Dionne Nall's sister who was injured and bleeding because she had four other children in her possession and no transportation.

16. That Izola Ricketts has continuously exhibited poor judgment by releasing Dionne Nalls to his mother's custody despite the fact that she is aware that Mary Nalls has on several occasions placed Dionne Nalls in danger.

17. That DCYF's involvement with the Respondent has been terminated and therefore, there can be no pending recommendations or case plans.

WHEREFORE, Respondent requests this Honorable Court grant him custody and placement of his son, Dionne Nalls.

mdg/hopkinsplacement
8/090401/1

Respondent,
By His Attorney,

Maureen D. Gemma, Esq.
Gelfuso & Lachut, Inc.
1193 Reservoir Avenue
Cranston, Rhode Island 02920
Tel.: 401-942-4300

Date: September 4, 2001

**NOTICE**

Please be advised that the within motion will be called for hearing on the 27th day of September, 2001 at 9:00 a.m. in the Providence Family Court, One Dorrance Plaza, Providence, Rhode Island.

**CERTIFICATION**

I hereby certify that a true and accurate copy of the within Motion was mailed via first class mail, postage prepaid, on the 5th day of September, 2001, to:

Attorney Patricia Petrella
DCYF
Office of Legal Counsel
101 Friendship Street
Providence, Rhode Island 02903

Attorney Joseph Palmieri
Palmieri & Palmieri
260 W. Exchange Street
Providence, RI

Attorney John O'Brien III
CASA Office
One Dorrance Plaza
Providence, Rhode Island 02903

mdg/hopkinsplacement
8/090401/1