UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RICARDO HOPKINS, Individually and as Parent and Next of Kin to DIONNE NALLS and ERICA HOPKINS, Plaintiff, | |
| VS. | C.A. NO. 04-373L |
| THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS; DEPARTMENT OF CHILDREN, YOUTH & FAMILY, JAY G. LINDGREN, JR., Individually and in His Capacity as Director of DCYF; THOMAS M. BOHAN, ESQ., Individually and in His Capacity as Executive Director Administration; THOMAS DWYER, Individually and in His Capacity as Associate Director Child Welfare Services; KEVIN AUCOIN, Individually and In His Capacity as Chief Legal Services; Suzan Morris, Individually and in Her Capacity as Senior Legal Counsel; PATRICIA PETRELLA, Individually and in Her Capacity as Legal Counsel to DCYF; ELLEN BALASCO, Individually and In Her Capacity as Legal Counsel to CASA; KAREN DEGENOVA, Individually and in Her Capacity as a DCYF Investigator, Defendant. | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS /**
**OPPOSITION TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

1. Karen DeGenova investigated Crystal Jones' allegations against Ricardo Hopkins. At the time of the investigation, DeGenova had been an investigator for DCYF for less than three months. (DeGenova Deposition at 5, attached hereto as Exhibit "1.")

N:/clients/Hopkins/pleadings/state.facts
JRD/071206/4

2. At the time DeGenova commenced the investigation, Ms. Jones was being treated at Butler Hospital. (DeGenova Deposition at 23-24, attached hereto as Exhibit "1.") DeGenova was aware of this because she met with Ms. Jones at Butler Hospital. (DeGenova Deposition at 17, attached hereto as Exhibit "1.")

3. DeGenova interviewed Jones for less than one hour. (DeGenova Deposition at 44, attached hereto as Exhibit "1.")

4. Ms. Jones informed DeGenova that Mr. Hopkins had sexually molested her while she was a foster child in the Hopkins' home but that the alleged sexual molestation had occurred over five years before. (DeGenova Deposition at 22, attached hereto as Exhibit "1.")

5. At the time DeGenova interviewed Jones, she established that Jones was in no danger from Mr. Hopkins. (DeGenova Deposition at 57-58, attached hereto as Exhibit "1.")

6. Despite this knowledge, on the same day, DeGenova went to Mr. Hopkins house to confront Mr. Hopkins with the allegation. (DeGenova Deposition at 24-26, attached hereto as Exhibit "1.")

7. Although Jones would later claim that Mr. Hopkins' niece, Sarah Hopkins, had been similarly sexually

abused and could corroborate her story, DeGenova did not seek corroboration of the allegations before she went to the Hopkins' home. (DeGenova Deposition at 53, 55, attached hereto as Exhibit "1.")

8. At the time of the investigation, DCYF records showed that the Hopkins home was not licensed to operate as a foster home. (DeGenova Deposition at 41-42, attached hereto as Exhibit "1.")

9. At the time of the investigation, DeGenova had no evidence that any children lived in the Hopkins home with Mr. Hopkins. She had no knowledge that Mr. Hopkins had children of his own. (DeGenova Deposition at 32, attached hereto as Exhibit "1.")

10. At the time she first went to the Hopkins' home, DeGenova had no knowledge that there had ever been any DCYF involvement with regarding to Erica Hopkins. (DeGenova Deposition at 76, attached hereto as Exhibit "1.")

11. DeGenova does not know who contacted Plaintiffs' employer regarding the investigation. (DeGenova Deposition at 60-61, attached hereto as Exhibit "1.")

12. During her investigation, DeGenova met with Tom Dwyer, DCYF assistant director to discuss the case. She was informed by her supervisor to tell Mr. Dwyer about the investigation because Mr. Hopkins was employed at a DCYF

licensed group home. (DeGenova Deposition at 50-52, attached hereto as Exhibit "1.")[1]

13. DeGenova cannot recall ever receiving training as an investigator regarding civil rights compliance, was not aware if DCYF had its own Civil Rights Compliance Officer, and could not recall ever meeting with anyone in the Department regarding Civil Rights Compliance. (DeGenova Deposition at 70, attached hereto as Exhibit "1.")

14. DCYF Policy No. 500.0010 - Accepting Report as an Early Warning(D) states that, absent a history of Departmental involvement, a report of Physical or Sexual abuse of a person who is now an adult if there are no minor children in the home is generally considered to be an "Early Warning" and not investigate. Caseworkers are instructed to refer the matter to the appropriate law enforcement agency. (See attached Exhibit "2.".)

15. DCYF Policy No. 500.0010 - Accepting Investigation - Report Meeting 4 Criteria states that Child Abuse/Neglect (CA/N) reports will not be accepted for investigation unless they show that "Harm or substantial risk of harm to the child is present." (Id.)

16. The Administration for Children and Families (ACF), within the U.S. Department of Health and Human

[1] Shortly thereafter, Mr. Hopkins was terminated from his job.

Services (HHS) is responsible for federal programs that promote the economic and social well-being of families, children, individuals, and communities. According to ACF statistics compiled with regard to children exiting foster care, Black children were reunified with their parents 58.9% of the time in 2001, in comparison with whites, 70.4%, and Asians, 70.8%. (Attached hereto as Exhibit "3.")

17. Defendant Ellen Balasco was legal counsel for Crystal Jones (a/k/a Krystal Jones) appointed by DCYF. During the family Court litigation, Plaintiffs' counsel repeatedly attempted to depose Crystal Jones in order to clear Mr. Hopkins name. Jones was subpoenaed to appear for a deposition on March 23, 2001, but neither she nor her attorney appeared. The Family Court issued an Order requiring DCYF to produce Ms. Jones. The Deposition commenced on March 29, 2001, but Ms. Balasco refused to allow Ms. Jones to ask even basic questions about her background. She then ended the deposition. (See attached Balasco transcript excerpt, Exhibit 4.)

18. Kevin Aucoin, Associate Director/Chief of Legal Services for DCYF, may have been the first attorney at DCYF involved in the case and that he was contacted by Plaintiffs' counsel during the beginning stages of the

investigation. (Aucoin Deposition at 20-21, attached hereto as Exhibit "5.")

19. Mr. Aucoin does not know who at DCYF was involved in the decision to notify Mr. Hopkins' employers that he was disqualified from his jobs. (Aucoin Deposition at 27-28, attached hereto as Exhibit "5.")

20. DCYF has no written protocol as to when an investigator is to begin the processes of informing a halfway house that one of its employees has been indicated. (Aucoin Deposition at 27-30, attached hereto as Exhibit "5.")

21. Kevin Aucoin admitted that Justice Goldberg had informed DCYF that she had "concerns" about DCYF's case. (Aucoin Deposition at 46 -48, attached hereto as Exhibit "5.")

22. On August 6, 2001, Judge Suttell of the Family Court entered a Decree stating that the Court could not find that the Department had met its burden that Mr. Hopkins had physically abused his children. (Exhibit 6.)

23. That Plaintiffs were then forced to file an additional Motion for Placement on September 5, 2001 seeking placement of the Dionne Nalls with Mr. Hopkins. (Exhibit 7.)

**PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

1. Plaintiff objects to the statement on the grounds that it is hearsay four times over (hearsay within hearsay within hearsay within hearsay). Crystal Jones purportedly made the statement to a social worker who then relayed the statement to the DCYF Child Abuse and Neglect Hotline. The DCYF employee taking the statement put the statement into written form. The writing was then forwarded to DCYF investigator Karen DeGenova.

2. Plaintiff objects to the statement on the grounds that it is based on hearsay. Plaintiff further objects to Defendants' classification of Mr. Hopkins home as an "active foster home."

16. Plaintiffs admit that the Summary of Facts was prepared by Ms. DeGenova. As to the factual assertions contained within, Plaintiff objects to the statement on the grounds that it is based on hearsay (four times over) of Crystal Jones (see objections in paragraph 1), hearsay of Jessica Jones (<u>five</u> times over), hearsay statements of Fran Guevremont and staff workers, and the statements of Dionne Nalls, Erica Hopkins and Douglas Nalls.

24. Denied.

29. Denied.

N:/clients/Hopkins/pleadings/state.facts
JRD/071206/4

49. Plaintiff admits the statement by the Court but denies that the Court's interpretation of statutory and constitutional law was correct. The original statements made by Crystal Jones were relayed to DCYF investigator DeGenova third-hand and therefore cannot be considered an exception to the hearsay rule as "credible hearsay." Likewise, the statements Ms. Jones gave to DeGenova directly were not made "presumably for the purposes of diagnosis or treatment" and are not an exception to the hearsay rule.

Plaintiffs,

By Their Attorney,

Joseph R. Daigle #5429
GELFUSO & LACHUT, INC.
1193 Reservoir Avenue
Cranston, RI 02920
Tel.: (401) 942-4300
Fax.: (401) 946-0970

**CERTIFICATION**

I hereby certify that a true and accurate copy of the within document was sent via U.S. mail, postage prepaid, on the 17 day of July 2006, to:

Richard B. Woolley, Esq.
Special Assistant to the Attorney General
Civil Division
150 South Main Street
Providence, RI 02903

N:/clients/Hopkins/pleadings/state.facts
JRD/071206/4