UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RICARDO HOPKINS, Individually and as Parent and Next of Kin to DIONNE NALLS and ERICA HOPKINS, Plaintiff, | |
| VS. | C.A. NO. 04-373L |
| THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS; DEPARTMENT OF CHILDREN, YOUTH & FAMILY, JAY G. LINDGREN, JR., Individually and in His Capacity as Director of DCYF; THOMAS M. BOHAN, ESQ., Individually and in His Capacity as Executive Director Administration; THOMAS DWYER, Individually and in His Capacity as Associate Director Child Welfare Services; KEVIN AUCOIN, Individually and In His Capacity as Chief Legal Services; Suzan Morris, Individually and in Her Capacity as Senior Legal Counsel; PATRICIA PETRELLA, Individually and in Her Capacity as Legal Counsel to DCYF; ELLEN BALASCO, Individually and In Her Capacity as Legal Counsel to CASA; KAREN DEGENOVA, Individually and in Her Capacity as a DCYF Investigator, Defendant. | |

AFFIDAVIT OF RICARDO HOPKINS

I, Ricardo Hopkins, hereby depose under oath and state the following upon my personal knowledge:

1. I am thirty-five years old and I reside in the Town of Foster Rhode Island.

2. When I was eight-years old, I was adopted by Nina Hopkins and Clinton Hoplins. While I was growing up in the Hopkins home, there were periods of time when it operated as a DCYF licensed foster home.

N:/clients/Hopkins.r/Pleadings/Aff.r.Hopkins
JRD/071201/3

3. I first met Crystal Jones in 1988. At the time, I was 16 years old and she was 6 years old.

4. The last time I saw Crystal before February 2001, was in 1995-96. At the time, she was returning to live with the Hopkins family after spending a short time with her birth mother. At that time, I was a college student at Rhode Island College and was studying law enforcement. When I first saw her at that time, Crystal hugged me and called me "Big Brother." Crystal stayed in the Hopkins home for only a few days before running away. I never saw or heard from her again until February 2001.

5. In 1998 or 1999, the Hopkins home stopped operating as a DCYF license foster home.

6. In 1996, I started a relationship with Mary Nalls. We had a child, Dionne Nalls and after my relationship with Mary Nalls ended, I shared joint custody with her.

7. At the time that DCYF began investigating Crystal Jones' accusations, I was working at two different group homes, Whitmarsh House and Communities for People as a counselor.

8. On February 13, 2001, I received a call at my home from Crystal Jones. At the time, Crystal was being treated at Butler Hospital. During our conversation, Crystal informed me that she had told DCYF that I had sexually abused her. She then tried to get me to admit that that I had molested her. I had never engaged in any sexual contact with Crystal and I told her so. She told me that she was going to hire an attorney and that she was going to "get it on TV."

9. In the early evening on February 13, 2001, CPI Investigator Karen DeGenova came to my home. At the time, I was living at the Hopkins home with Nina Hopkins, my girlfriend, Stephanie Morgan, and my three-year-old daughter Erica. DeGenova identified herself as an investigator for DCYF and informed us of the reason for her visit. I immediately sensed hostility from her.

10. Though DeGenova never said anything to me in that meeting that I can point to as racist, as an African-American growing up in a largely white community (Foster),

N:/clients/Hopkins.r/Pleadings/Aff.r.Hopkins
JRD/071201/3

I have dealt with people who treat me differently because of the color of my skin. This has happened often enough that I can usually sense when it is happening. I believe that DeGenova's reaction to me when I first opened the door that evening was similar to these reactions and her attitude toward me never changed from that point.

11. From the very beginning, DeGenova was accusatory. She seemed to have already made up her mind that Crystal Jones' accusations were true and did not appear open to my side of the story. When Nina (who is now deceased) or Stephanie tried to inform DeGenova of why they did not think Crystal's accusations could be true, DeGenova ignored them.

12. Crystal's allegations are ridiculous. She claimed that I had sexually molested her three times per week when she was between the ages of six and fourteen, well over 1000 times.

13. DeGenova also asked me if I had ever hit Erica. I admitted that on one occasion, I had taken a short, light-weight piece of reed from a bush in our yard and lightly tapped Erica across her open hands. This did not cause a mark.

14. DeGenova asked to speak with Erica alone. Feeling that I had no choice, I agreed. DeGenova met with Erica for approximately five minutes. Shortly after meeting with Erica, DeGenova left. She was only at the house for a total of fifteen minutes.

15. DeGenova returned shortly with two Foster Police Officers. She informed me that she was going to indicate me for use of excessive force in disciplining Erica and that I could either choose to leave the home, or she would take Erica. I was stunned. However, I did not want Erica staying with a stranger and so I agreed to leave.

16. I understand from DeGenova then contacted Izola Ricketts, Mary Nalls' mother. Although Rickets first told DeGenova that I was "good man" and a "good father," she later called DeGenova back and informed her that she had just recalled that Douglas Nalls (Dionne's half-brother) had told her once that when he used to come visit me with Dionne, I would sexually molest him. (He later denied that he had said this.) At the time, however, I had just filed

a petition in the Family Court to get full custody of Dionne from Mary Nalls. DeGenova either did not know about this or did not think it was relevant.

17. DeGenova then called me by phone. She was openly hostile and sarcastic when she told me about what Izola Ricketts had said. DeGenova seemed to be enjoying herself when she told me, "Oh, Mr. Hopkins, this case just keeps on growing!"

18. Around this same period of time, I was fired from my employment at Communities for People and the Whitmarsh House. Both informed me that I was disqualified from working because of information they had received by DCYF.

19. I was now without income and could not return to my home. I applied for unemployment compensation and, though I received benefits, in January 2002, I was informed that I had to reimburse the Department of Labor and Training for $11,336.000 in benefits I had received. The reason given was that because of the indication, I had been "discharged for misconduct." (See the Notice of Claim Disqualification attached hereto as Exhibit "1.") At the time I was fired, however, I had always received good evaluations from my supervisors and it was clear to me that the only reason for my discharge was the indication from DCYF.

20. The Family Court litigation dragged on for many months. I was forced to borrow approximately $70,000 to pay my legal fees. Throughout the litigation, DCYF workers and attorney's continued to treat me as a criminal and a danger to my children. In fact, even toward the end of the litigation when it seems that I was going to be cleared of all of the charges, DCYF continued to try to get me to agree to enter into one of their treatment plans. If I admitted that I had a problem and agreed to treatment as an abuser, they would allow me to return home to my family. I was eventually cleared of all the charges of excessive discipline. (DCYF never commenced any separate proceedings on the claims of Crystal Jones.) Even after the Family Court entered a Decree clearing me of these charges, DCYF delayed reuniting me with Dionne for another two months.

21. After I was cleared of the charges, I attempted to get my jobs back with Communities for People and Whitmarsh House. I was informed that, even though I had

been cleared by the Family Court, the indication would stay on my record for three years unless I filed a petition to expunge my record and I could not return to work until this was done. I filed the petition and my record was expunged on several months after the charges were dismissed in July 2001. Unfortunately, when I reapplied for my job at Whitmash House, Mike Terry of Whitmarsh informed me that I would be treated as a new applicant despite my previous employment. Craig Gordon of Communities for People refused to even take or return my calls.

22. Prior to this incident, I had worked at two group homes and was looking forward to getting a degree in social work. Ironically, I hoped to one day be a CPI investigator at DCYF. I felt that my personal experience growing up in a foster home and my job experience at the group homes would be very useful to me in that field. Working in two group home was very helpful to my education. Not only did my shifts leave me free to attend classes, but the group homes gave tuition reimbursement for courses taken. Because of the way I was treated by DCYF during the investigation of this matter, however, I have given up my plans of working in the social services field. I feel that I will always be viewed by people at DCYF with suspicion and distrust.

Ricardo Hopkins

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

Then appeared before me in the County of Providence, on the 14th. day of July 2006, Ricardo Hopkins, having been duly sworn, and stated that the above statements were true to the best of his knowledge and information.

Notary Public
My Commission Expires: 6/20/09

N:/clients/Hopkins.r/Pleadings/Aff.r.Hopkins
JRD/071201/3

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

# Department of Labor and Training

Central Adjudication Unit, P.O. Box 20067, Cranston, R. I. 02920-0941
Tel. No.: (401) 462-8300

No. _______________

## NOTICE TO CLAIMANT OF DISQUALIFICATION

Mailing Date January 10, 2002 [xx] New [ ] Refile Social Security Number 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

Ricardo S. Hopkins
51 Central Pike
Foster, RI 02825

DEPARTMENT OF LABOR & TRAINING
BENEFIT ACCURACY MEASUREMENT UNIT
PO BOX 20450
CRANSTON, R.I. 02920-0945

Communities For People

Name of Employer

Office and Number

Y ı filed your claim stating you were laid off due to a lack of work. S ɔsequent employer information indicated that you were discharged after they were notified b a state agency that you had been indicated on a finding that disqualifies you from w rking with youth. Since you can no longer perform the duties of your job due to your o ı actions, it is determined that you were discharged for misconduct. You are denied b ıefits as indicated below.

Y ı receive waiting period credit for week ending 3/17/01 and benefits for week(s) ending 3 :4/01 through 9/15/01. These weeks are now under disqualification. Your waiting period is voided and you are overpaid $11,336.00. You are at fault for this overpayment because y ı failed to notify the department that you had been terminated for cause. Based upon t : evidence, it is determined that since you received benefits to which you were not e :itled, it would not defeat the purpose of the Employment Security Act to make restitution o these funds. You are required to make repayment under Section 28-42-68 of the Rhode I ınd Employment Security Act. You are directed to send a check, in the amount of $ ,336.00, to Department of Labor & Training Central Overpayment Unit, P.O. Box 20380, C ınston, RI 02920-0944, Telephone #(401)-462-8010. Sections 42-61-7/1 and 44-30.1-1 of the R General Laws had been amended to allow the recovery of overpayments and interest from a individual's state personal income tax refund and lottery winnings.

ɪIS DISQUALIFICATION COVERS THE PERIOD INDICATED BELOW ACCORDING TO SECTION 28-44-18 ~~28-42-68~~ (See over):

[xx] The week ending 3/10/01 and until you have had at least eight weeks of work and in each of said weeks have earned an amount equal to or in excess of One Hundred Twenty Three Dollars $123.00 Dollars.

[ ] The ............ week(s) ending ............ If you are unemployed after the expiration of the disqualification period, you may file another claim for determination of your rights to benefits thereafter.

[ ] The week ending ............ and for an indefinite number of weeks thereafter, until you meet the requirements of the Law. If, at a later date you believe there is a change in the facts on which this determination was based, you may file another claim for determination of your rights to benefits thereafter.

Authorized Representative of the Director [signature]

### RIGHT TO APPEAL

If you disagree with this determination, you must file a written appeal within **15 days of the mailing date** indicated on this decision or it **WILL BECOME FINAL.**

You may file an appeal either by **Mail or by Fax.** Please indicate your name, social security number, current address, telephone number and reason(s) you wish to appeal in your correspondence.

Mail your appeal request to: Central Adjudication Unit, P. O. Box 20067, Cranston, R. I. 02920-0941

FAX number: (401) 462-8300

Once your appeal is received you will be mailed further instructions. However, it will be necessary for you to continue mailing your weekly certification notice to the Call Center until you are notified of the result of your appeal.

| | |
|---|---|
| White - Claimant | Pink - Local Office |
| Yellow - Employer | Gold - CAU |

See reverse side of this form for section of the Act referred to in this Decision.