UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

HOPKINS HOPKINS, Individually and as Parent and Next of Kin to DIONNE NALLS and ERICA HOPKINS,
Plaintiffs,

V. C.A. NO. 04-373L

THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS; DEPARTMENT OF CHILDREN, YOUTH, & FAMILY, JAY G. LINDGREN, JR., Individually and in his capacity as Director of DCYF; THOMAS M. BOHAN, ESQ., Individually and in his capacity as Associate Director Child Welfare Services, KEVIN AUCOIN, Individually and in his Capacity as Chief Legal Services, SUZAN MORRIS, Individually, and in her Capacity as Senior Legal Counsel; PATRICIA PETRELLA, Individually and in her capacity as Legal Counsel to DCYF; ELLEN BALASCO, Individually and in her capacity as Legal Counsel to CASA; KAREN DEGENOVA, Individually and in her Capacity as a DCYF Investigator,
Defendants.

PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
DEFENDANTS'MOTION FOR SUMMARY JUDGMENT

This matter was called to be heard on September 28, 2006 on Defendants' Motion for Summary Judgment. During the hearing, arguments were heard regarding relevant constitutional precedent that had not been referenced in

the briefs of either party. This Supplemental Memorandum is submitted at the request of the Court to address that case law.[1]

ARGUMENT

Too understand Plaintiffs' interpretation of the case law, the Court must first know the specific acts that lead to Plaintiffs' 42 USC 1983 claims. First, Plaintiffs allege violations of their constitutionally protected rights by DCYF investigator Karen DeGenova.

a. DeGenova's investigation was unfair and abusive

As stated in Plaintiffs' Opposition Memorandum, DeGenova was already in violation of DCYF's enabling statute and regulations when she first set foot in the Hopkins' home. The following facts are set forth with supporting documentation in Plaintiffs' Statement of Undisputed Facts:

1. DeGenova was the first person to investigate Crystal Jones' allegations against Ricardo Hopkins.
2. At the time DeGenova commenced the investigation, the complainant, Ms. Jones, was being treated at Butler Hospital.

[1] Although this memorandum addresses issues arising in relation to Plaintiffs' 1983 claims, Plaintiffs do not waive the other constitutional and state law claims that appear in their Complaint.

3. DeGenova interviewed Jones for less than one hour.
4. Ms. Jones, an adult, informed DeGenova that Mr. Hopkins had sexually molested her while she was a foster child in the Hopkins' home but that the alleged sexual molestation had occurred over five years before.
5. DeGenova knew that Jones was in no danger from Mr. Hopkins. She also had no information indicating that there were any children living with Mr. Hopkins. (DCYF Policy No. 500.0010 mandates that Child Abuse/Neglect (CA/N) reports will not be accepted for investigation unless they show that "Harm or substantial risk of harm to the child is present.")

Mr. Hopkins was not Ms. Jones' parent or foster parent. The Abused and Neglected Children Statute that enables DCYF to investigate child abuse claims by parents and foster parents defines "child" as a person under the age of eighteen (18). R.I.G.L. 40-11-2(2). Because Crystal Jones was nineteen at the time of the reported abuse, DCYF did not have jurisdiction over her claims and should have just referred the matter to the police. DCYF's own regulations (DCYF Policy No. 500.0010) and the Abused

and Neglected Children Statute prohibited Ms. Degenova from commencing an investigation. Despite all of this, on the same day DeGenova met with Jones, she went to Mr. Hopkins house to confront Mr. Hopkins. DeGenova gained entry into the Hopkins' home and used her authority as a DCYF investigator to bully the family into cooperating with her investigation.

DeGenova's investigation could implicate constitutional rights even before she removed the child from Mr. Hopkins' custody if her investigation was conducted "unfairly." Wojcik v. North Smithfield, 874 F.Supp. 508, 520 (1995). An investigation may be considered unconstitutional if conducted "abusively." Id. The evidence shows that DeGenova went to the Hopkins' home (in violation of department procedure) and confronted Mr. Hopkins in a hostile and accusatory manner. (Affidavit of Ricardo Hopkins.) In the span of a few minutes, she had abandoned the investigation of Ms. Jones' claims and started a new investigation about Erica.

It is not difficult to imagine that at trial a jury would be shocked to learn that DCYF has claimed for itself the right to initiate investigations based upon the uncorroborated statements of mental patients and use those statements as a the launching point into any matter DCYF

investigators deem of interest. DCYF's investigation was patently abusive and unfair.

b. DeGenova removed the child from her father without sufficient investigation, credible information or reasonable suspicion of abuse

DeGenova further violated Plaintiffs' constitutional rights when she removed Erica from her fathers' custody. As the Strail case shows (infra), to survive summary judgment on such a claim, Plaintiffs must demonstrate that DCYF acted without 1.) sufficient investigation, 2.) credible information, or 3.) reasonable suspicion of abuse, past or imminent. To apply the Strail analysis, the Court must focus on what DeGenova knew at the time she removed Erica from her father:

1. Crystal Jones, a mental patient at Butler Hospital, had accused Mr. Hopkins of sexually assaulting her when she was a child. There is nothing in the record to suggest that she ever claimed that Mr. Hopkins ever used excessive discipline on her or bound her feet and hands.
2. Mr. Hopkins admitted that he had used a switch to tap Erica's hand as punishment. (Ms. Degenova's physical

examination of Erica failed to note any marks consistent with this mild punishment[2].)

3. Three and ½ year old Erica, in an interview with DeGenova lasting no more than five minutes, allegedly claimed that her father had previously tied her hands and feet as punishment. (Again, DeGenova failed to note any marks on Erica consistent with tying.)

Defendants claim in their Supplemental Brief that DeGenova corroborated Jones' allegations that evening by 1.) interviewing the therapist and Crystal Jones, 2.) by corroborating the layout of the Hopkins' home, and 3.) "by speaking with the mother who conceded the tying and spanking when confronted with the switch." (Defendants' Supplemental Memorandum at 2.) At best, this defense presents a factual issue to be determined at trial. The only person involved in Ms. Jones' treatment that Ms. DeGenova attempted to speak to prior to going to the Hopkins' home on February 13, 2001 was a social worker named Yolanda Gabrielle. A copy of the CPS Investigative Summary created by Ms. DeGenova listing each person she interview with the dates and times is attached to

[2] In comparison, the Strail Court denied summary judgment to DCYF on a claim against it arising from allegations that it removed a child from custody after a report of 1.) one slap to the child's face 2.) one slap to the child's arm 3.) a recent history of substance abuse and 4.) exposure to pornography in the home (discussed at length below).

Defendants' Memorandum. It shows that Ms. DeGenova attempted to contact Ms. Gabrielle at 3:15 p.m. During her deposition, however, Ms. DeGenova testified that she did not recall if she actually was able to interview Ms. Gabrielle on that day. (DeGenova Deposition at 18, attached hereto as Exhibit 1.) (DeGenova's records show that she also interviewed Ms. Gabrielle the next day at 11:30 a.m. after Erica Hopkins had been removed from her father's custody.) Therefore, it is a question of fact whether Ms. DeGenova corroborated Ms. Jones claims with Ms. Gabrielle before going to the Hopkins home.

It is also unclear what Defendants mean when they state that DeGenova corroborated the abuse allegation "by speaking with the mother who conceded the tying and spanking when confronted with the switch." Plaintiffs are unaware of any such conversation occurring before Erica was removed from her father's custody. It is not noted in the Investigative Worker's Observations/Recommendations that DeGenova drafted to summarize her investigations (which Defendants submitted in support of their Summary Judgment Motion). Nor did she testify to such a conversation in her deposition.

Ms. Jones' allegations do not corroborate the statements Erica allegedly made that night that her father

tied her hands and feet. There is no evidence that Erica Hopkins ever claimed inappropriate touching by her father. There was no evidence that Mr. Hopkins ever sexually assaulted Erica. The sexual abuse allegation does not *corroborate* the excessive discipline allegation.[3]

The next question is whether the statement allegedly made by Erica that she had been tied is sufficient grounds for her removal without Jones' allegation. The Strail decision sets forth the appropriate test: a state agency may not separate parent and child without 1.) sufficient investigation, 2.) credible information, and 3.) a reasonable suspicion of abuse, past or imminent. 62 F. Supp. 2d 519, 532 (1999). The allegations of tying were not sufficiently investigated, nor were they based on credible evidence.

In Strail, the Plaintiff parents sued DCYF pursuant to 42 USC §1983 based upon two dissimilar instances of children being removed from the parents' custody. Defendants moved for summary judgment on qualified immunity

[3] Nor did DCYF consider Ms. Jones' allegations of sexual assault to be sufficiently credible to pursue the investigation. DCYF's prosecution of Ricardo Hopkins was based on the excessive discipline of Erica and Dionne and on subsequently obtained (unfounded) charges of molestation. Even a cursory review of the DCYF documents and pleadings demonstrate, however, that DCYF opened case files on behalf of Erica Hopkins and Dionne and Douglas Nalls, not for Crystal Jones. In fact, Jones' allegations lack any real probative value and, due to their prejudicial nature, it is questionable whether they would ever be entered into evidence at trial in the face of a motion *in limine*.

grounds. The Court granted summary judgment on one claim but not on the other.

In the first instance, the circumstances surrounding DCYF's removal of the couple's daughter Natalie "reasonably warranted" the extraordinary exercise of police power. Id. at 530.

> A couple's quarrel had already enticed Richard (the father), a recovering alcoholic, to embark on a binge of dangerous proportions. He had already emptied an entire bottle of vodka, and Lorena (the mother) believed that he had taken Prozac, Antabuse and Valiu. When the police arrived, Richard was in such a state that he required immediate medical attention. . . . [I]t is reasonable to believe that the police communicated to DCYF a description of Richard's drunken and excited state and the general level of turmoil in the household that evening. . . . Renzi [the DCYF investigator] reported that Lorena was afraid that she was Richard when she knocked at the door. Lorena also state that although Richard was not physically abusive to her, he was "out of control" that night.

Id. at 530-531. Based on these facts, the Court granted DCYF's motion for summary judgment.

The second incident in Strail involved the removal of the couple's daughter Sarah from their custody several weeks later. At that time, Lorena had been informed by DCYF that she could resume living with Richard and his daughter Sarah and Sarah had returned home.

> However, upon learning that Richard was, in fact, living in the home again, Morgan [a DCYF investigator] removed Sarah with hardly a moment's attention to evaluating the family's current situation. At best,

N:/clients/Hopkins.R/pleadings/Supp.memo.in.opp
JRD/110906/6

> she based the removal on the facts surrounding Richard's three week-old alcoholic binge and Sarah's report of being slapped once on the face and once on the arm. However, DCYF made no investigation into Richard's condition on October 30. Nor did Morgan have any evidence that Richard's binge had been anything but a onetime slip off the wagon. Furthermore, the details of Sarah's slaps are murky at best. Were the slaps violent or gently scolding. Was Sarah hurt? Did she cry? These important details are undeveloped in the record. Because defendants rely on the slaps to partially justify Sarah's removal, these disputed facts are material.

Id. at 531-532. The Strail Court denied Defendant's motion for Summary Judgment with regard to the claim involving Sarah.

The Strail decision notes the importance of "sufficient investigation" when government action interferes with family integrity. The Court cites with approval the case of Gottlieb v. Orange County Department of Social Services. 84 F.3d 511 (2nd Cir. 1996). Gottlieb dealt with the investigation of sexual assault on a young child. The investigation that was conducted in that case illuminates the failures of DCYF in the present matter. At the time of the investigation, the child, Dawn, was five years old. Id. at 513. The County Child Protective Services received a complaint from an adult who cared for the child after school that Dawn's father would expose himself to his children and fondle her at night. Id. at 514. The investigator interviewed Dawn's younger brother.

Id. (He did not disclose any abuse.) She interviewed Dawn at her school for 45 minutes to an hour. Id. During the interview, Dawn confirmed the allegations that her father had exposed himself to her and that he had inappropriately touched her on at least three occasions. Id. at 514-515. After the interview, the investigator interviewed the school nurse and Dawn's teacher regarding Dawn's behavior. Id. The investigator then contacted law enforcement and, along with a State Trooper, interviewed Dawn a second time. Id. They then interviewed Dawn's mother who admitted that Dawn could have gotten the idea for the allegations when she was accidentally exposed to a pornographic movie. Id. It was only then that the child care worker gave the parents the choice of the father leaving home or the children being taken into custody. Id. There was insufficient investigation to support DCYF's actions.

The next step in the Strail analysis is whether Erica Hopkins' statements were credible. In Forest v. Pawtucket Police Department, this Court dealt with the issue of whether probable cause for arrest could be found when there was almost no corroboration of a fifteen-year-old boy's claims that he was inappropriately touched by his teacher. 290 F. Supp.2d 215. The only corroboration of the boy's claims was the fact that he had previously complained of

the inappropriate touching to his mother and the school principal. Id. at 223.

> . . . Jeffrey made a coherent and credible complaint that the police officers could rely upon to establish probable cause. Detective Feeley had Jeffrey's oral and written statements accusing Forest of grabbing and rubbing Jeffrey's penis. Jeffrey previously made the same allegations to his mother and Detective Smith who found the child believable. Detective Feeley knew that Jeffrey also made the same allegations orally and in writing to Principal Rouselle. Jeffrey told Detective Feely that he had no reason to hurt Forest because Forest had given Jeffrey's family Christmas gifts and a gift certificate to Shaw's Supermarket. Detective Feeley had no reason to doubt Jeffrey's reliability.

Id. at 228. The Complaining witness in this case was three and ½ years old. There was no evidence she had ever complained to anyone else about being tied. It would have been very easy for DeGenova to have Erica repeat the allegations to the police when they arrive later that evening to learn if she would change her story or repeat the allegations consistently. There is no evidence that on the record that she did so.

The Strail decision relies on the Gottlieb case for the key test in forced separation cases: "whether the information available to the defendant at the time would have created an objectively reasonable suspicion of abuse justifying interference with parental rights." Id. at 527. DCYF's actions in this matter fail the Strail/Gottlieb

test. DeGenova's suspicions were not objectively reasonable at the time that the decision was made to remove Erica from her father's custody.

Rather than obtaining confirmation of sexual abuse, DeGenova, when she could not corroborate Jones' claims, commenced a new investigation based solely upon Mr. Hopkins' admission that he had once used a switch on his daughter's hand. She met with Erica alone for five minutes on one occasion, not for forty-five minutes to an hour on two separate occasions like in Gottlieb. Unlike in Gottlieb, DeGenova did not check with disinterested persons who had been in contact with the child to learn about her health, behavior, or whether she had ever complained of the abuse. Therefore, she did not have an objectively reasonable suspicion of abuse.

c. Defendant may not rely on statutory authority to shield them from liability where the statue in question is unconstitutional

Though the Court has not asked the parties to revisit the issue in their supplemental briefs, Defendants argue that they are shielded from liability on Plaintiffs' tortiuous interference and other claims because by statute they were obligated to make Hopkins' employees aware that he had acquired "disqualifying status" (had been indicated). Plaintiffs allege that after Mr. Hopkins had

been cleared of all charges, DCYF's records continued to show that he had an indication against him. Defendants have never denied this fact. In order to re-apply for his job as a social worker, Mr. Hopkins was required to file a motion to expunge his records. (See the affidavit of Ricardo Hopkins filed in support of his Opposition to the Motion for Summary Judgment.)

Prosecutions by DCYF are, therefore, unique to our legal system in that the mere initiation of an investigation by DCYF, regardless of its merits, automatically invalidates the person investigated from applying for certain types of employment even after the person has been cleared of the charges. DCYF has turned the presumption of innocence on its head.

***WHEREFORE***, Plaintiffs pray that this Court enter an Order denying Defendants' Summary Judgment Motion.

Plaintiffs,

By Their Attorney,

_/s/ Joseph R. Daigle____

Joseph R. Daigle #5429
GELFUSO & LACHUT, INC.
1193 Reservoir Avenue
Cranston, RI 02920
Tel.: (401) 942-4300
Fax.: (401) 946-0970

**CERTIFICATION**

I hereby certify that a true and accurate copy of the within document was sent electronically on the following on November 9, 2006, to:

Richard B. Woolley, Esq.
Special Assistant to the Attorney General
Civil Division
150 South Main Street
Providence, RI 02903

_/s/ Joseph R. Daigle____

N:/clients/Hopkins.R/pleadings/Supp.memo.in.opp
JRD/110906/6