UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


RICARDO HOPKINS, Individually and
as Parent and Next of Kin
to DIONNE NALLS and ERICA HOPKINS,
        Plaintiffs,

        v.                                          C.A. No.  04-373L

THE STATE OF RHODE ISLAND AND
PROVIDENCE PLANTATIONS; DEPARTMENT
OF CHILDREN, YOUTH & FAMILY; JAY G.
LINDGREN, JR., Individually and in his
capacity as Director of DCYF; THOMAS
M. BOHAN, ESQ., Individually and in his
capacity as Executive Director Administration;
THOMAS DWYER, Individually and in his
capacity as Associate Director Child
Welfare Services; KEVIN AUCOIN, Individually
and in his capacity as Chief Legal Services;
SUZAN MORRIS, Individually and in her
capacity as Senior Legal Counsel; PATRICIA
PETRELLA, Individually and in her
capacity as Legal Counsel to DCYF; ELLEN
BALASCO, Individually and in her capacity
as Legal Counsel to CASA; KAREN DEGENOVA,
Individually and in her capacity
as DCYF Investigator,
        Defendants.

DECISION AND ORDER

Ronald R. Lagueux, Senior District Judge.

    This case is before the Court on Defendants' Motion for

Summary Judgment.  Plaintiffs' claims stem from actions taken by

employees of the Rhode Island Department of Children, Youth and

Families ("DCYF") in 2001, when Plaintiff Ricardo Hopkins, an

African-American, was the subject of a child abuse investigation

by the state agency.  Plaintiffs Dionne Nalls and Erica Hopkins,

the minor children of Ricardo Hopkins, are the children on whose behalf the investigation was conducted.  Plaintiffs have brought a six-count complaint, which includes federal constitutional claims and state common law tort claims, as well as a request that this Court enjoin DCYF and order permanent changes in the way the agency operates.  Defendants have moved for summary judgment on all counts in the Complaint.  For the reasons explained below, the Court grants Defendants' Motion.

## Standard of review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the Court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party.  <u>Continental Casualty Co. v. Canadian Universal Ins. Co.</u>, 924 F.2d 370, 373 (1st Cir. 1991).  In this case, as the Defendants have moved for summary judgment, the Court has accepted the version of the facts as presented by the Plaintiffs. The Court has relied on the account supplied by the Defendants only to fill in gaps when the Plaintiffs have omitted events that were necessary to sketch out a coherent chronology.

The law is clear that summary judgment must be granted if there are no disputed issues of material fact, and the moving party is entitled to judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  The United States Supreme Court has observed that Rule 56(c) mandates an entry of summary

judgment against a party who fails to make a sufficient showing to establish an element essential to that party's case, and on which that party bears the burden of proof at trial.  Id., 477 U.S. at 322.  The test is whether or not, as to each essential element, there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).

### Factual and procedural background

On February 12, 2001, DCYF was notified by Butler Hospital, a private psychiatric hospital in Providence, Rhode Island, that Crystal Jones, a 19-year old patient at the facility, had accused Ricardo Hopkins of sexually abusing her from 1988 to 1996. During that time period, Jones was between the ages of six and fourteen years old and a foster child at the home of Nina Hopkins.  At age fourteen, Jones ran away from the foster home. Ricardo, who is ten years older than Crystal, had been adopted by Nina Hopkins several years before the alleged abuse was said to have occurred.  According to Ricardo, Jones had had a history of sexual abuse, substance abuse and emotional problems, both before and after her time as a foster child at the Hopkins home.  At the time of her hospitalization, Jones was still in DCYF custody.

DCYF assigned the Jones sexual abuse case to Defendant Karen DeGenova, an agency caseworker, who, on February 13, 2001,

-3-

visited the Foster, Rhode Island, home of Nina Hopkins, where
Ricardo lived with his girlfriend, Stephanie Morgan, and their
daughter, Plaintiff Erica Hopkins.  DeGenova confronted Ricardo
with Jones' claims of sexual abuse, which were adamantly denied
by Ricardo, his girlfriend, and his mother, Nina.

On discovering that Ricardo had children of his own,
DeGenova next turned her inquiry to his parenting.  He admitted
to using a switch once to punish Erica by tapping her across her
open hands.  DeGenova then questioned Erica privately for
approximately five minutes.  According to Ricardo's account,
Erica confirmed that she had been hit with a switch, but denied
that she and her father had had any contact of a sexual nature.

After spending no more than fifteen minutes at the Hopkins
home, DeGenova left and called her supervisor from her car.  She
soon returned to the house with two Foster police officers.  She
informed Ricardo that he would be reported for using excessive
force with Erica, and indicated that she would remove Erica from
the home unless Ricardo agreed to leave.  Faced with these
options, Ricardo chose to leave his mother's house and went to
stay with a friend.

Over the next several days, DeGenova continued her
investigation, interviewing Ricardo's other children who did not
live with him full time, including a three-year old son,
Plaintiff Dionne Nalls, a five-year old daughter, Tyasia, and

-4-

Dionne's half brother, Douglas.[1]  According to Defendants, these children told DeGenova that they had all been spanked and hit with a switch by Ricardo, and that he had also bound their hands and feet.  Douglas also said that, while his hands and feet were tied, Ricardo had put a dirty sock in his mouth and put him in the shower.

According to Ricardo's affidavit, DeGenova also interviewed Dionne Nalls' grandmother, Izola Ricketts.  Ricketts initially told DeGenova that Ricardo was a good father, but subsequently called back and said she had just remembered that Douglas Nalls complained of being sexually molested by Ricardo.  Douglas later denied that he had made this accusation, and Ricardo states that Ricketts was just attempting to take sides in a custody dispute already underway between Ricardo and Dionne's mother, Mary Nalls, over Dionne's placement.[2]

Crystal Jones told DeGenova that Ricardo had been investigated in the past for sexually molesting another foster child, as well as his niece, Sarah Hopkins.  According to Ricardo, DeGenova made no effort to corroborate these allegations.  Later, while under oath in Family Court, Sarah Hopkins denied that she had been molested by Ricardo.  Moreover,

---

[1] Douglas is not related to Ricardo, but occasionally accompanied his brother to Ricardo's house.

[2] Mary Nalls is Izola Rickett's daughter.

a subsequent investigation failed to turn up any record of prior
criminal complaints or DCYF investigations involving Ricardo.

Nonetheless, DeGenova ultimately concluded that Erica and
Dionne were in danger of sexual abuse and other neglect, based
upon Jones' allegations and the other allegations, and DCYF filed
a petition against Ricardo in Family Court on February 22, 2001.

At the time of the investigation, Ricardo was employed as a
counselor at two state-operated residential facilities for
adolescents under DCYF care, Whitmarsh House and Communities for
People.  The day after Ricardo was ordered out of his house, his
employers were notified, possibly by Defendants Thomas Dwyer
and/or Kevin Aucoin, of the investigation into Jones' sexual
abuse allegations.  Despite his excellent work history, Ricardo's
employment at both group homes was immediately terminated.

On March 1, 2001, Hopkins was arraigned in Rhode Island
Family Court on charges of child abuse.  DCYF was represented in
court by Defendant Patricia Petrella, Senior Legal Counsel to the
agency.  Ricardo requested a probable cause hearing, which took
place on March 7 and was continued in order for Ricardo to depose
Jones.  Jones was deposed on March 29, but, according to Ricardo,
the deposition was not fruitful because her DCYF-appointed
counsel (actually a court-appointed special advocate), Defendant
Ellen Balasco counseled Jones to refrain from answering pertinent
questions.

-6-

On March 30, 2001, Ricardo filed a Motion to Dismiss DCYF's petition.  In support of the Motion, Ricardo argued that DCYF had exceeded its legal authority by conducting the initial investigation, because Crystal Jones, at age nineteen, was not a 'child' as defined by the Abused and Neglected Children Statute, Rhode Island Gen. Law § 40-11-2(2), and that, moreover, there was no present or imminent risk of harm to her, as required by DCYF Policy 500.0010, because the alleged abuse had taken place over five years before, and Ricardo was not her parent, foster parent nor had he ever been in any way responsible for her welfare.[3] Consequently, his argument continued, any information that resulted from the investigation of Jones' allegations was tainted ("fruit of the poisonous tree"), should be expunged, and could not provide a predicate for a petition against Ricardo.  The Family Court proceedings, he concluded, lacked legal basis and therefore violated his constitutional rights to procedural and substantive due process.

On April 27, 2001, Judge Paul Suttell of the Family Court

---

[3] DCYF Policy No. 500.0010, entitled "Criteria for a Child Protective Services Investigation," requires four criteria be present in order for a report of child abuse to be investigated by the agency.  One of those mandatory criteria is that, "Harm or substantial risk of harm to the child is present."  The policy states further that reports of abuse of a person now an adult will generally not be investigated, unless there are minor children in the home or there is prior DCYF involvement.  These incidents may be referred to the appropriate law enforcement agency.

(now a member of the Rhode Island Supreme Court) denied Ricardo's Motion to Dismiss, ruling that the investigation was "legitimately instituted."  In his decree, Judge Suttell explained that, once notified by Butler Hospital of Jones' claims, DCYF was obligated to investigate because: 1) Jones, though nineteen, was still in DCYF custody; 2) the alleged abuse took place in a DCYF-licensed foster home; 3) and because Ricardo was employed at the DCYF-operated group homes.  Judge Suttell ruled further that there was probable cause to proceed on charges that Ricardo had engaged in excessive and inappropriate discipline of Dionne and Erica, and enjoined Ricardo from exercising any form of physical discipline on any child. However, Judge Suttell also concluded that there was no evidence that the children were in danger of sexual abuse.  Ricardo was permitted to return home, with the proviso that his contact with Erica be supervised by Stephanie Morgan, or another DCYF-approved adult.

On May 18, 2001, Ricardo filed a petition for Writ of Certiorari to the Rhode Island Supreme Court seeking to overturn the order of the Family Court, based on the same already-advanced arguments concerning the legitimacy of the Jones investigation and their bearing on his constitutional rights.  Ricardo also sought to stay the Family Court proceedings.  The request for a stay was denied without prejudice by Justice Maureen McKenna

Goldberg of the Rhode Island Supreme Court on May 23, and the case was remanded to the Family Court for completion of the evidentiary hearing.  Ricardo later withdrew his Petition for a Writ of Certiorari on December 5, 2003.

The probable cause hearing on the excessive discipline charges went forward in Family Court during May and June of 2001. On July 3, 2001,[4] Judge Suttell dismissed the portion of the petition charging that Ricardo had sexually abused Crystal Jones, finding that DCYF had presented insufficient evidence to support those charges.  However, he ruled that the evidence was sufficient to establish probable cause that Ricardo had bound the hands and feet of Douglas and Dionne as punishment, which "creates a great risk of physical and emotional harm to the children and, in my judgment, is inappropriate and excessive." The case was then put over for further hearing until July 30, 2001.  At the subsequent proceedings, DCYF was unable to establish by clear and convincing evidence that Ricardo had physically abused his children, and the petition was dismissed in its entirety on August 6, 2001.

On October 25, 2001, DCYF granted Ricardo's administrative appeal and amended its records to indicate that all charges against him were unfounded.  On October 31, 2001, Dionne's

---

[4] This ruling was not entered as a decree until August 8, 2001.

mother, Mary Nalls, was adjudged an unfit parent by the Family Court.  In November 2001, Ricardo was allowed unsupervised visits with Erica and Dionne.  However, his request for full custody of Dionne was initially rejected by DCYF, despite Mary Nalls' disqualification.  On December 7, 2001, the Family Court finally granted Ricardo custody and placement of Dionne.

After the termination of his employment at the DCYF group homes, Ricardo received unemployment compensation.  However, in January 2002, he was informed that he was obligated to reimburse the Department of Labor and Training for the $11,336.00 because he had been 'discharged for misconduct.'

In August 2004, Ricardo filed his complaint in Rhode Island Superior Court.  It was removed by Defendants to this Court, pursuant to 28 U.S.C. § 1441.

### The Complaint

Plaintiffs name ten defendants in their complaint, including the State of Rhode Island; the State's Department of Children, Youth and Families; the director and six employees of DCYF; and an attorney for the Family Court's Court-Appointed Special Advocate program ("CASA"), Ellen Balasco.  The allegations against all persons named in the Complaint are made against them in both their individual and official capacities.

Count I of the Complaint alleges that Plaintiffs' right to equal protection under the law was violated by Defendants when

they investigated and prosecuted Ricardo for child abuse, in
accordance with the agency's official policies, based on
circumstances which would not have resulted in an investigation
of a non-minority family.  The DCYF investigation resulted from a
conspiracy on the part of all Defendants to discriminate against
Plaintiffs and deprive them of their constitutional rights.  In
this Count, Plaintiffs allege further that DCYF engages in a
pattern of practices that discriminate against minority families,
evidenced by statistics reflecting, *inter alia*, the higher ratio
of minority children removed from their families compared with
non-minority children.

In Count II, Plaintiffs allege that Defendants acted, and
conspired to act, under color of state law to deprive them of
property and liberty interests without substantive or procedural
due process. These interests include Ricardo's right to pursue
his occupation, his right to protect his reputation, and his
right to parent his children.  Plaintiffs allege further that
DCYF regulations denied Ricardo his presumption of innocence,
limited his right to appeal and denied him due process by
maintaining allegations on its records for three years even after
they were dismissed.

The remaining counts sound in state law.  Count III alleges
tortious interference with a contractual relationship because
Defendants caused Ricardo to lose his jobs at the DCYF group

homes.  Count IV is for defamation, because Defendants branded
Ricardo as a sex offender.  Count V for wrongful intrusion,
pursuant to R.I. Gen. Laws § 9-1-28.1, alleges that Defendants
published and republished information about Ricardo that he had a
reasonable expectation would remain private.  Count VI alleges
that Defendants were negligent when they recklessly rushed to
judgment about Ricardo and ignored pertinent facts gleaned in the
course of their investigation.

In their prayer for relief, Plaintiffs seek not only
damages, punitive damages and costs, but also a permanent
injunction preventing DCYF from discriminating on the basis of
race and employing procedures that deny due process.  Plaintiffs
further seek a decree requiring Defendants to prepare and
implement procedures which afford protections of constitutional
rights, with ongoing supervision by this Court of the plan's
implementation.

## Analysis

Although Plaintiffs have fashioned an extensive and complex
complaint founded on many legal theories, the analysis required
by the Court follows a line of cases recently decided here and in
this Circuit (and cited by the parties herein), such as Kauch v.
DCYF, 321 F.3d 1 (1st Cir. 2003); Hatch v. DCYF, 274 F.3d 12 (1st
Cir. 2001); and Strail v. DCYF, 62 F. Supp. 2d 519 (D.R.I. 1999).
The determinative issue in those cases was whether or not

defendant DCYF employees had qualified immunity for acts undertaken in their individual capacities while carrying out their professional duties.  This issue will also be central to the Court's analysis of the present allegations.

### Ellen DeGenova

The Court's analysis focuses on the actions of DCYF caseworker, Ellen DeGenova, because her investigation is the triggering event for the injuries alleged by Plaintiffs, and because she is essentially the only person named in the Complaint who actually carried out any activities.  Her actions included: interviewing Crystal Jones; confronting Ricardo Hopkins at his home; separating Ricardo from his daughter Erica; interviewing other members of Ricardo's family; discussing the case with her supervisors; and preparing a report that resulted in a petition being filed in Family Court alleging that Ricardo had physically abused his children.  Notwithstanding Ricardo's statistical evidence about the treatment of minorities by DCYF,[5] there is no evidence to establish that DeGenova herself was motivated by racial animus; nor is there evidence that she was motivated by malice.  If her actions were not entirely appropriate, they were perhaps overzealous.  In any case, she is shielded from liability

---

[5] Plaintiffs submit data from the U.S. Department of Health and Human Services which shows that in Rhode Island, for the year 2001, black children exiting foster care were reunified with their parents 58.9% of the time, as compared with 70.4% for white children and 70.8% for Asian children.

for her actions by the doctrine of qualified immunity, which
"provides a safe harbor for a wide range of mistaken judgments."
Hatch v. DCYF, 274 F.3d at 19.

The invocation of the qualified immunity doctrine requires a
test of two or, in some courts, three prongs. Saucier v. Katz,
533 U.S. 194, 201 (2001); Hatch, 274 F.3d at 20. First, the
plaintiff must establish a violation of a constitutional right.
Second, the Court must determine whether the right was clearly
established at the time of the violation; that is, whether the
public official had fair warning. Finally, the Court must
determine whether a reasonable and similarly-situated official
would have understood that his or her conduct violated that
right. Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003).

The substance of this test has been clearly established in
other DCYF cases in this jurisdiction. First, this Court has
recognized that, "The interest of parents in the care, custody,
and control of their children is among the most venerable of the
liberty interests embedded in the Constitution." Hatch, 274 F.3d
at 20. However, this right must be balanced by society's
interest in the safety and best interests of its children. The
liberty interest at stake includes "no constitutional right to be
free from child abuse investigations." Kauch, 321 F.3d at 4.
Knowing the significant constitutional interests, as a reasonable
DCYF caseworker would, he or she would understand that only "an

-14-

objectively reasonable suspicion of abuse" would justify taking protective measures that might interfere with those interests in order to assure the safety of a child.  <u>Hatch</u>, 274 F.3d at 24.

In <u>Hatch</u>, the contested protective measure was temporary custody of the child prior to a hearing.  The Court in <u>Kauch</u> held that a caseworker with an objectively reasonable suspicion of abuse may recommend to the Family Court that a family be monitored.  321 F.3d at 4.  In <u>Strail v. DCYF</u>, this Court structured the test slightly differently, determining at the first prong that, while the Constitution does protect the parent-child relationship and the right to family integrity, those rights are not "absolute or unqualified." 62 F. Supp. 2d at 528. In that case, which involved the temporary removal of two children from the home, this writer concluded as follows, "As far as a parent's right to the care, custody, and management of a child is concerned, a parent has the right not to have his or her child removed without sufficient investigation and credible information supporting a reasonable suspicion that abuse has occurred or will occur imminently." <u>Id.</u> at 530.

In the present case, an objectively reasonable suspicion of child abuse will, as a matter of law, provide DeGenova with the protection of qualified immunity for the actions she took to initiate and pursue the child abuse investigation against Ricardo Hopkins, even if that suspicion was ultimately determined to be

unfounded.  Although qualified immunity provides a shield from
prosecution for public officials and is not a defense on the
merits, Forest v. Pawtucket Police Dept., 377 F.3d 52, 56 (1st
Cir. 2004), the Court's analysis of the 'objectively reasonable
suspicion' standard does ultimately result in a determination
about the constitutionality of Plaintiffs' treatment by DCYF.

    The Court holds that DeGenova's activities resulted from
suspicions that, right or wrong, were objectively reasonable.
She first received a phone call from a staff person at Butler
Hospital reporting Crystal Jones' allegations of Ricardo's sexual
abuse.  All those who interviewed Jones appear to have found her
credible, including the staff of the psychiatric hospital who
presumably are experienced at dealing with delusional patients.
When DeGenova interviewed Ricardo he denied Jones' allegations,
but he admitted to using a switch to discipline his toddler,
Erica.  Erica and Ricardo's other young children reported that he
had bound their hands and feet and hit them with a switch.
Douglas Nalls, who was occasionally in the care of Ricardo,
claimed that in addition to the punishments endured by the other
children, he had also been gagged, bound and put in the shower.
Taken together, these reports provide more than enough material
to ring a warning bell for a reasonable DCYF caseworker.

    This analysis is essentially the same one performed by Judge
Suttell of the Rhode Island Family Court in ruling on Ricardo's

-16-

Motion to Dismiss.  To the extent that this Court's analysis
coincides with the determination already reached in Family Court,
this Court can rely on principles of *res judicata* and collateral
estoppel to further support its ruling.

> ### *Res judicata and collateral estoppel*

> Under *res judicata*, a final judgment on the
> merits of an action precludes the parties or
> their privies from relitigating issues that
> were or could have been raised in that
> action.  Under collateral estoppel, once a
> court has decided an issue of fact or law
> necessary to its judgment, that decision may
> preclude relitigation of the issue in a suit
> on a different cause of action involving a
> party to the first case.

Allen v. McCurry, 449 U.S. 90, 94 (1980).  In Allen, a state
trial judge denied defendant's Fourth Amendment-based motion to
suppress evidence in his criminal trial for drug possession.
After his conviction, the defendant filed a § 1983 action in
federal court for unconstitutional search and seizure.  The
District Court granted summary judgment, holding that the
criminal defendant was barred by collateral estoppel from
relitigating the constitutionality of the police search.  But the
Court of Appeals reversed and remanded the case for trial, citing
the special role of the federal courts in protecting civil
rights.  449 U.S. at 93.  Noting that McCurry had had a full and
fair opportunity to litigate the legality of the search in the
state court, the Supreme Court reversed the appellate court.

-17-

> For reasons already discussed at length,
> nothing in the language or legislative
> history of § 1983 proves any congressional
> intent to deny binding effect to a state-
> court judgment or decision when the state
> court, acting within its proper jurisdiction,
> has given the parties a full and fair
> opportunity to litigate federal claims, and
> thereby has shown itself willing and able to
> protect federal rights.  And nothing in the
> legislative history of § 1983 reveals any
> purpose to afford less deference to judgments
> in state criminal proceedings than to those
> in state civil proceedings.  There is, in
> short, no reason to believe that Congress
> intended to provide an unrestricted
> opportunity to relitigate an issue already
> decided in state court simply because the
> issue arose in a state proceeding in which he
> would rather not have been engaged at all.

449 U.S. at 103-104.

It is unquestionable that Ricardo had a full and fair
opportunity to litigate the legality of the DCYF investigation
and the corollary constitutional issues in Rhode Island Family
Court.  When Judge Suttell denied Ricardo's Motion to Dismiss and
determined that the investigation was "legitimately instituted,"
he was essentially determining that the investigation was based
on "reasonable suspicion," as this Court has decided.  Although
Erica and Dionne were not litigants in Family Court, the basis of
their present claims comes down to the same issue - the
legitimacy and constitutionality of the DCYF investigation.  This
Court will not provide Plaintiffs an opportunity to relitigate
this issue.

*State law claims*

Qualified immunity protects DeGenova from further
prosecution of Plaintiffs' constitutional claims.  Because there
is no evidence of racial discrimination on the part of DeGenova
and because her actions were based on a reasonable suspicion of
child abuse, DeGenova has not violated Plaintiffs' civil rights,
or denied him due process.  Qualified immunity also protects
DeGenova from the Rhode Island state law claims: tortious
interference with contractual relations; defamation; wrongful
intrusion; and negligence.

Although the Rhode Island Supreme Court has yet to
explicitly adopt the doctrine of qualified immunity, it has been
invoked in this Court in cases such as this one which plead both
federal and state causes of action.  See Jennings v. Pare, 2005
WL 2043945 (D.R.I. 2005) (overturned on other grounds at Jennings
v. Jones, 479 F.3d 110 (1st Cir. 2007)).  The First Circuit
reviewed the status of qualified immunity in Rhode Island in
Hatch v. Town of Middletown, 311 F.3d 83 (1st Cir. 2002).  In
that case, Hatch sued the town and its police officers for
releasing information to the press about the child abuse
investigation which was the  subject of the previously-cited
Hatch v. DCYF, 274 F.3d 12 (Hatch I).  In Hatch II, the
plaintiff's claims included a § 1983 action for false arrest in
violation of the Fourth Amendment, and both federal and state law

claims that his right to privacy had been violated.   In a bench
ruling, Judge Ernest Torres of this Court granted defendants'
motion for summary judgment, dismissing both the federal and
state claims against all defendants.   He specifically determined
that the two named police officers could invoke qualified
immunity to escape liability under Rhode Island's privacy
statute.   311 F.3d at 84.   Subsequently, Hatch appealed this
portion of the ruling based, not on the use of qualified
immunity, but on the ambiguity in Rhode Island law about the
confidentiality of the records released to the press.   The First
Circuit affirmed the ruling, citing two Rhode Island Supreme
Court cases for support,[6] The Court wrote:

> Significantly, Pontbriand and Ensey reflect
> Rhode Island's recognition of a qualified
> immunity defense under state law analogous to
> the federal doctrine established by the
> United States Supreme Court in Harlow v.
> Fitzgerald, cited with approval in both Rhode
> Island decisions, and routinely applied in §
> 1983 cases.   Hence, we conclude that Hatch's
> concession that qualified immunity is
> available to officers defending state law
> claims is well grounded in the law of Rhode
> Island.

311 F.3d at 90 (citing Harlow v. Fitzgerald, 457 U.S. 800
(1982)); see also Carter v. Lindgren, 2006 WL 2850572, p. 7
(D.R.I. 2006).

---

[6] Ensey v. Culhane, 727 A.2d 687 (R.I. 1999) and Pontbriand
v. Sundlun, 699 A.2d 856 (R.I. 1997).

Accordingly, this Court holds that Defendant Karen DeGenova has a qualified immunity which shields her from liability for the Counts sounding in state law, as well as the constitutional claims in the Complaint.

### The other Defendants

Plaintiffs have sued six other DCYF employees and a CASA attorney in their individual capacities in connection with the investigation and prosecution of Ricardo for child abuse.  These Defendants include Jay G. Lindgren, Jr., the director of DCYF at the time of these events; Thomas M. Bohan, Esq., executive director of administration of DCYF; Thomas Dwyer, associate director of child welfare services and possibly the person who notified Ricardo's employers of the allegations against him; Kevin Aucoin, chief of legal services and possibly the person who notified Ricardo's employers of the allegations against him; Suzan Morris, senior legal counsel; Patricia Petrella, legal counsel who represented DCYF in the Family Court proceedings; and Ellen Balasco, legal counsel for CASA who represented Crystal Jones when she was deposed by Ricardo's lawyer.  According to Ricardo, these Defendants, whose role in the events appears to be limited to those actions listed above, are liable because they conspired together to commit the constitutional violations alleged in the complaint.  It is well established that an actual denial of a civil right is an essential element for a cause of

-21-

action for conspiracy to deny civil rights.  <u>Goldschmidt v.
Patchett</u>, 686 F.2d 582, 585 (7th Cir. 1982).  In addition,
evidence of a meeting of the minds is necessary as well.  <u>Id.</u> at
585.  This Court has written, "The First Circuit requires that
'allegations of conspiracy be supported by material facts, not
merely conclusory statements.'"  <u>D'Amario v. Russo</u>, 718 F. Supp.
118, 122 (D.R.I. 1989) (citations omitted).

In its analysis of Karen DeGenova's actions, the Court has
determined that the investigation and prosecution of Ricardo was
based on a reasonable suspicion of child abuse, and,
consequently, was not violative of his due process rights.
Furthermore, Plaintiffs have submitted no facts that might
demonstrate a conspiracy.  Accordingly, this Court holds that
there is insufficient evidence to establish a § 1983(2)
conspiracy against the individual capacity Defendants for the
constitutional violations alleged in Counts I and II.

Moreover, the Court must underscore that Plaintiffs were
afforded all the process that was constitutionally due them.  The
First Circuit has explained that a deprivation of a
constitutionally-protected interest in liberty or property is not
actionable under § 1983:

> ...unless and until the State fails to
> provide due process.  Therefore, to determine
> whether a constitutional violation has
> occurred, it is necessary to ask what process
> the State provided, and whether it was
> constitutionally adequate.

Rumford Pharmacy v. East Providence, 970 F.2d 996, 999 (1st Cir.
1992) (quoting Zinermon v. Burch, 494 U.S. 113, 125-126 (1990)).

Once DeGenova's petition was filed in Rhode Island's Family
Court, Ricardo experienced more than adequate process.  He
attended several hearings; he was represented by counsel; he had
the opportunity to hear the evidence against him and to cross
examine witnesses; he filed and received rulings on two Motions
to Dismiss; and he filed an appeal with the Rhode Island Supreme
Court.  As a matter of law, this Court holds that this process is
constitutionally adequate.

### State law claims

The four claims sounding in Rhode Island law are not pled as
conspiracy claims.  Consequently, there is nothing to link Jay
Lindgren, Thomas Bohan or Suzan Morris to the events described in
the Complaint, and summary judgment is granted on behalf of these
Defendants, in their individual capacities, for all Counts in the
Complaint.

Kevin Aucoin and Thomas Dwyer are described as possibly
being the individuals who reported the allegations against
Ricardo to his employers.  Patricia Petrella represented DCYF in
Family Court and Ellen Balasco represented Crystal Jones in a
deposition.  To the extent that the Court will credit the cursory
allegations against them with any analysis, these individuals
were clearly and indisputably doing their jobs, acting well

within the scope of their professional authority in reliance on
DeGenova's proper investigation, and are not liable for any of
the Counts alleged in the Complaint.  Consequently, those
portions of the Complaint that include allegations against these
Defendants in their individual capacities are also dismissed as a
matter of law.

### Official Capacity Defendants

Plaintiffs have sued all eight individual Defendants in
their official capacity, as well as the State of Rhode Island and
the State's Department of Children, Youth and Families.  A suit
against an individual in his or her official capacity is treated
as a suit against the government entity where that individual
works.  Kentucky v. Graham, 473 U.S. 159, 165-166 (1985).
Because the government entity is the real party in interest, then
the entity's policies must have played a part in the alleged
violation.  Hafer v. Melo, 502 U.S. 21, 25 (1991).

In this case, Plaintiffs claim that DCYF operates in a way
that is racially discriminatory and that its procedures are
constitutionally defective.  They seek a permanent injunction to
prevent DCYF from continuing to operate unconstitutionally, as
well as a plan to modify DCYF policies that would be implemented
with Court oversight.

In order to establish that DCYF policies are
unconstitutional, Plaintiffs must be able to demonstrate that

-24-

those policies produced a constitutional violation.  Burrell v.
Hampshire County, 307 F.3d 1, 10 (1st Cir. 2002). "To establish
liability, we look at whether there was a 'direct causal link'
between the policy and the violation, or if the policy 'actually
caused' the violation."  307 F.3d at 10 (citing City of Canton v.
Harris, 489 U.S. 378 (1989)); *see also* Lipsett v. University of
Puerto Rico, 864 F.2d 881, 902 (1st Cir. 1988).

The Court has already determined that Ricardo's
investigation and prosecution for child abuse was based on
reasonable suspicion and thereby constitutional.  With no
constitutional violation, Plaintiffs have no standing to pursue a
claim for injunctive relief.  Charron v. Picano, 811 F. Supp.
768, 775 (D.R.I. 1993).  Consequently, Plaintiffs' claims against
all Defendants in their official capacity are dismissed.

### Conclusion

For the reasons stated above, the Court grants Summary
Judgment in favor of Defendants on all Counts in the Complaint.
In light of this decision, Defendants' Motion to Strike
Plaintiffs' Affidavit is rendered moot.  The Clerk shall enter
judgment for all Defendants, as indicated, forthwith.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
June 21, 2007

-25-